Jared D. Scott (#15066)
**ANDERSON & KARRENBERG, P.C.**
250 E. 200 S., Ste. 340
Salt Lake City, Utah 84111
Telephone: (801) 534-1700
Email: jscott@aklawfirm.com
*Attorneys for Plaintiff*

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| EMILY JEAN BOERS, derivatively on behalf of PACS GROUP, INC., <br><br> Plaintiff, <br><br> v. <br><br> JASON MURRAY, DERICK APT, EVELYN DILSAVER, MARK HANCOCK, JOSHUA JERGENSEN, TAYLOR LEAVITT, MICHELLE LEWIS, JACQUELINE MILLARD, and PETER SANFORD, <br><br> Defendants, <br><br> and <br><br> PACS GROUP, INC., <br><br> Nominal Defendant. | Case No: <br><br> **JURY TRIAL DEMANDED** |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Plaintiff Emily Jean Boers ("Plaintiff"), by Plaintiff's undersigned attorneys, derivatively and on behalf of nominal defendant PACS Group, Inc. ("PACS" or the "Company"), files this Verified Shareholder Derivative Complaint against defendants Jason Murray ("Murray"), Derick Apt ("Apt"), Evelyn Dilsaver ("Dilsaver"), Mark Hancock ("Hancock"), Joshua Jergensen

("Jergensen"), Taylor Leavitt ("Leavitt"), Michelle Lewis ("Lewis"), Jacqueline Millard ("Millard"), and Peter Sanford ("Sanford") (collectively, the "Individual Defendants," and together with PACS, "Defendants") for breaches of their fiduciary duties as controlling shareholders, directors and/or officers of PACS, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and contribution under Section 11(f) of the Securities Act of 1933 (the "Securities Act") and Section 21D of the Securities Exchange Act of 1934 (the "Exchange Act"). As for Plaintiff's complaint against the Individual Defendants, Plaintiff alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding PACS, legal filings, news reports, securities analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

**NATURE OF THE ACTION**

1.      This is a shareholder derivative action that seeks to remedy wrongdoing committed by the Individual Defendants from April 11, 2024 through December 16, 2024, both dates inclusive (the "Relevant Period").

2.      PACS represents itself to be "a holding company investing in post-acute healthcare

facilities, professionals, and ancillary services."[1] Founded in 2013, PACS is one of the largest post-acute platforms in the United States, with its independent subsidiaries operating 315 post-acute care facilities across 17 states and serving nearly 30,000 patients daily.

3.      Post-acute facilities provide additional assistance to individuals recuperating from acute conditions, illnesses, or medical procedures once they have been discharged from the hospital. A large percentage of the patients who use PACS' facilities are beneficiaries under Medicaid and Medicare, and, as a result, a substantial amount of PACS' revenue is derived from payments from these programs. Under the Medicare program, PACS will receive higher payments from patients who require a greater level of skilled care than those who do not.

4.      Additionally, PACS has historically driven its growth by acquiring underperforming long-term custodial care Skilled Nursing Facilities ("SNFs") and turning them into high acuity, high value short-term transitional care skilled nursing facilities.  PACS operates a subsidiary called Providence Administrative Consulting Services, Inc. ("PACS Services") which supports the Company's regulatory compliance obligations across its organizations, including through controlled billing and cost reporting practices and provides legal, risk management, and compliance support.

5.      Medicare beneficiaries who require a higher level of skilled care can drive up to three times more revenue per day than Medicaid for a SNF. Typically, in order for a patient to qualify as needing a higher level of skilled care under Medicare the patient must typically "have spent a minimum of three consecutive inpatient days in the hospital." During the COVID-19 pandemic, the CMS waived this requirement in order to reduce hospital overcrowding, allowing

---

[1] https://ir.pacs.com/

patients to access Medicare Part A benefits if the patient showed a need for skilled nursing care (the "COVID Waiver"). However, under the COVID Waiver, potential COVID exposure and even a positive COVID test result did not qualify the patient for higher skilled care benefits, since the COVID Waiver required skilled medical necessities such as ventilator weaning or intensive monitoring in order to use the COVID Waiver. The COVID Waiver expired on May 11, 2023.

6.      On March 13, 2024, PACS filed its registration statement to the SEC for its April 2024 initial public offering (the "IPO") on Form S-1 which was later declared effective on April 10, 2024 ("IPO Registration Statement"). On April 12, 2024, PACS filed the IPO Prospectus on Form 424B4 to the SEC, which formed part of the IPO Registration Statement (collectively, with attendant materials filed or published with these forms, the "IPO Materials"). PACS issued 21,428,572 shares of common stock at $21.00 per share which netted the Company proceeds of $450 million.

7.      On September 3, 2024, PACS filed a registration statement for a secondary offering on Form S-1 (the "SPO Registration Statement") to the SEC. On September 6, 2024, PACS filed a prospectus for the SPO on Form 424B4 to the SEC, which formed part of the SPO Registration Statement (the "SPO Prospectus" and together with the SPO Registration Statement and attendant materials filed or published with these forms, the "SPO Materials"). During the SPO, PACS issued 2,777,778 shares of common stock at $36.25 per share which netted the Company $100.7 million in proceeds.

8.      Leading up to and throughout the Relevant Period, the Individual Defendants either made or caused the Company to engage in various forms of conduct that violated state and federal laws and regulations pertaining to medical billing procedures, and, *inter alia*, resulted in the Company being subjected to numerous federal investigations.

9.      For example, on April 8, 2024, PACS Services and Paradise Valley Healthcare Center received a Civil Investigative Demand ("CID") from the United States Department of Justice ("DOJ") requesting information and documents to determine whether PACS Services and Provide Valley Healthcare Center violated the False Claims Act by submitting false claims to Medicare.

10.     On September 11, 2024, the Company received another CID from the DOJ requesting information from its California facilities to determine whether the Company violated the False Claims Act by submitting false claims to Medicare.

11.     On September 30, 2024, Providence Group, Inc., a Company subsidiary, received a CID from the DOJ requesting information and documents relating to an investigation into the Bishop Care Center SNF, in order to determine whether Providence Group, Inc. violated the False Claims Act by submitting false claims to Medicare pertaining to COVID related Hospital Stay Waivers.

12.     On February 26, 2025, the Company received a subpoena from the DOJ per the Health Insurance Portability and Accounting Act ("HIPAA") relating to investigations into fraudulent statements made to the United States.

13.     The Company is also subject to an SEC investigation related to PACS' accounting and financial reporting and disclosures and its internal controls over financial reporting and disclosure controls.

14.     During the Relevant Period, the Individual Defendants, in breach of their fiduciary duties owed to PACS, willfully or recklessly made and/or caused the Company to engage in various forms of conduct that violated state and federal healthcare laws and regulations and, *inter alia,* resulted in the Company being subject to various government investigations. Specifically, the

Individual Defendants willfully or recklessly caused the Company to, *inter alia*: (1) falsely bill Medicare at the Company's SNFs in violation of the COVID Waiver (the "COVID Waiver Misconduct"); (2) falsely bill Medicare for unnecessary and/or unperformed respiratory therapies (the "Respiratory Therapy Misconduct"); (3) falsely bill Medicare for unnecessary sensory therapies (the "Sensory Therapy Misconduct"); (4) manipulate patient stays in order to extend the Company's ability to bill to Medicare (the "Regeneration Misconduct"); (5) *inter alia*, falsely stated the length and frequency of therapies in order to maximize its billing to Medicare (the "Other Billing Misconduct", collectively with the COVID Waiver Misconduct, Respiratory Therapy Misconduct, Sensory Therapy Misconduct, and the Regeneration Misconduct, the "Billing Misconduct"),  (6) engaged in patient neglect (the "Patient Neglect Misconduct"); (7) engaged in practices to circumvent licensing requirements at PACS' SNFs (the "Licensing Misconduct"); (8) violated state SNF staffing laws by falsely listing uncertified employees as certified (the "Certification Misconduct," and with the Licensing Misconduct, the "Licensing and Certification Misconduct"); and (9) violated various state laws pertaining to medical records (the "Medical Record Misconduct").

15.     Throughout the Relevant Period, the Individual Defendants either made or caused the Company to make false and misleading statements, relating to its controls over financial reporting and compliance with laws and regulations. For example, the IPO Materials touted the Company's approach to its billing practices, stating:

> ***Our rigorous approach to billing integrity, our independent internal compliance function, and our regular facility billing audits are intended to provide a foundation of trust*** and collaboration that makes us a natural choice for payors.[2]

---

[2] All emphasis has been added unless otherwise stated.

16.     On August 12, 2024, the Company filed its quarterly report on Form 10-Q with the SEC for the second quarter of 2024 (the "2Q 2024 Form 10-Q"). The 2Q 2024 Form 10-Q described PACS' noncompliance with billing practices as infrequent, stating:

> We review and audit the care delivery, recordkeeping and billing processes of our operating subsidiaries. ***These reviews from time to time detect instances of noncompliance that we attempt to correct, which in some instances requires reduced or repayment of billed amounts or other costs.***

17.     The truth began to emerge on November 4, 2024 when Hindenburg Research published a report titled "PACS Group: How To Become A Billionaire In The Skilled Nursing Industry By Systematically Scamming Taxpayers" (the "Hindenburg Report"). The Hindenburg Report included interviews with 18 former PACS employees and analyzed more than 900 PACS facility reports. Notably, the Hindenburg Report detailed how PACS had manipulated a COVID-era waiver program and falsely shifted patients to Medicare claims which "***drove more than 100% of PACS' operating and net income from 2020 – 2023***, enabling PACS to IPO in early 2024 with the illusion of legitimate growth and profitability." The Hindenburg Report further alleged that, when the profitability gleaned from engaging in such scheme began to dry up, PACS maintained its inflated revenue streams by "***bill[ing] thousands of unnecessary respiratory and sensory integration therapies to Medicare Part B regardless of clinical need or outcomes***." In addition, the Hindenburg Report reported that PACS began to skirt regulations by engaging in a "***scheme whereby PACS attempted to fool regulators by 'renting' licenses from third parties to 'hang' on buildings***" and then "***either employ[] unlicensed administrators*** or ha[ve] administrators manage multiple buildings in excess of state mandated limits." The Hindenburg Report further detailed how "***PACS secretly lists uncertified nurse aids (NAs) as certified*** in the system, in an apparent scheme to cheat staffing ratios" and "***retroactively add fake RN hours***" in order "to meet minimum

staffing requirements, boost star ratings, and avoid costly penalties."

18.     On this news, the price per share of PACS stock fell $11.93, or approximately 27.78%, from a closing price of $42.94 per share on November 1, 2024, to close at $31.01 per share on November 4, 2024, on unusually heavy trading volume.

19.     The truth continued to emerge on November 6, 2024, before the market opened, it was announced that PACS would postpone its earnings release for the fiscal third quarter of 2024. It was further revealed that the Company had "*received civil investigative demands from the federal government regarding the Company's reimbursement and referral practices that may or may not be related to this week's third-party report*."

20.     On this news, the price per share of PACS stock fell $11.45, or approximately 38.8%, from a closing price of $29.54 per share on November 5, 2024, to close at $18.09 per share on November 6, 2024, after unusually heavy trading volume.

21.     The truth fully emerged on December 17, 2024, when the Company's underwriter, J.P. Morgan, announced it had downgraded the Company's stock citing substantial "overhang" caused by the federal investigation into the Company's reimbursement and referral practices.

22.     On this news, the price per share of PACS stock fell $1.23, or approximately 8.1%, from a closing price of $15.18 per share on December 16, 2024 to close at $13.95 per share on December 17, 2024, after unusually heavy trading volume.

23.     During the Relevant Period, the Individual Defendants breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements regarding the Company's business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements that failed to disclose, *inter alia*, that: (1) PACS

engaged in the Billing Misconduct, the Patient Neglect Misconduct, the Licensing and Certification Misconduct, and the Medical Record Misconduct; (2) as a result of the misconduct, PACS' revenues were artificially inflated and required a restatement; (3) PACS' compliance with laws and regulations were overstated; and (4) as a result of the foregoing, PACS' risk disclosures mischaracterized adverse facts that the Company was actually facing as mere possibilities. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

24.    Additionally, in breach of their fiduciary duties, the Individual Defendants willfully or recklessly caused the Company to fail to maintain adequate internal controls while, at the same time, six of the Individual Defendants engaged in improper insider sales while the Company's stock price was artificially inflated due to the false and misleading statements discussed herein, netting combined total proceeds of approximately *$669.5 million*.

25.    In light of the Individual Defendants' misconduct—which has subjected the Company, its Chief Executive Officer ("CEO"), its former Chief Financial Officer ("CFO"), its interim CFO, its Chief Operating Officer ("COO"), its former President of PACS Services, its Chief Accounting Officer ("CAO"), and three of its directors to a federal securities class action lawsuit pending in the United States District Court for the Southern District of New York (the "Securities Class Action") and which has further subjected the Company to the need to undertake internal investigations, the need to implement adequate internal controls, losses from the waste of corporate assets, losses associated with the civil investigative demands PACS received from the federal government regarding the Company's reimbursement and referral practices, and losses due to the unjust enrichment of the Individual Defendants who were improperly overcompensated by

the Company and/or who benefitted from the wrongdoing alleged herein—the Company will have to expend many millions of dollars.

26. The Company has been substantially damaged as a result of the Individual Defendants' knowing or highly reckless breaches of fiduciary duty and other misconduct.

27. In light of the breaches of fiduciary duty engaged in by the Individual Defendants, most of whom are the Company's current directors, of the collective engagement in fraud and misconduct by the Company's directors, of the substantial likelihood of the directors' liability in this derivative action, of Defendants Murray's, Hancock's, Apt's, Jergensen's, Lewis's, Millard's, Leavitt's, Dilsaver's, and Sanford's liability in the Securities Class Action, and of their not being disinterested and/or independent directors, a majority of the Company's Board of Directors (the "Board") cannot consider a demand to commence litigation against themselves on behalf of the Company with the requisite level of disinterestedness and independence.

## JURISDICTION AND VENUE

28. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 because Plaintiff's claims raise a federal question under Section 11(f) of the Securities Act (15 U.S.C. § 77k(f)(1)), and Section 21D of the Exchange Act (15 U.S.C. § 78u-4(f)). Plaintiff's claims also raise a federal question pertaining to the claims made in the Securities Class Action based on violations of the Exchange Act and the Securities Act.

29. This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367(a).

30. This derivative action is not a collusive action to confer jurisdiction on a court of the United States that it would not otherwise have.

31. Venue is proper in this District because the alleged misstatements and wrongs

complained of herein entered this District, the Defendants have conducted business in this District, and Defendants' actions have had an effect in this District.

## PARTIES

### Plaintiff

32.     Plaintiff is a current shareholder of PACS. Plaintiff has continuously held PACS common stock at all relevant times.

### Nominal Defendant PACS

33.     PACS is a Delaware corporation with its principal executive offices at 90 S. 400 W. Suite 700, Salt Lake City, Utah 84101. PACS' common stock trades on the New York Stock Exchange ("NYSE") under the ticker symbol "PACS."

### Defendant Murray

34.     Defendant Murray founded PACS in 2013 and has served as the Company's CEO and as Chairman of the Board since its inception. According to the proxy statement filed on Schedule 14A with the SEC on November 25, 2025 (the "2025 Proxy Statement"), Defendant Murray beneficially owned 54,626,199 shares of the Company's common stock, representing 34.9% of the Company's voting power. As a result, Defendant Murray is a controlling shareholder of the Company.

35.     During the Relevant Period, while the Company's stock price was artificially inflated and before the schemes were exposed, Defendant Murray made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| April 11, 2024 | 1,607,142 | $21 | $33,749,982 |
| September 9, 2024 | 8,128,352 | $36.25 | $294,652,760 |

Thus, in total, before the fraud was exposed, Defendant Murray sold 9,735,494 shares of Company

stock on inside information, for which he received approximately $328.4 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the schemes.

36.     The Company's website states the following about Defendant Murray:[3]

Jason has more than 20 years of experience working as an executive in acute and post-acute healthcare settings and is a licensed nursing home administrator. He is the chief executive officer and one of two founders/owners of PACS Group Inc., a rapidly growing national platform investing in the continuum of post-acute care, including post-acute care professionals, ancillary services, and 315 post-acute facilities in 17 states across the country.

Jason is a Fellow of the American College of Healthcare Executives (FACHE) and holds a master's degree in healthcare administration. He was named 2023 Mountain West Entrepreneur of the Year by Ernst & Young and was a finalist for their national Entrepreneur of the Year competition that same year.

He enjoys anything related to sports and athletics and stays active with his busy lifestyle, which comes with being married with five children.

**Defendant Apt**

37.     Defendant Apt served as the Company's CFO from January 1, 2024 until his resignation on September 2, 2025. Defendant Apt also served as PACS' President of Corporate Finance and Treasurer from April 2018 until January 2023, and as Executive Vice President, Chief Investment Officer, and Treasurer from January 2023 until January 2024.

38.     During the Relevant Period, while the Company's stock price was artificially inflated and before the schemes were exposed, Defendant Apt made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| April 11, 2024 | 129,249 | $21 | $2,714,229 |

---

[3] https://ir.pacs.com/corporate-governance/board-of-directors

Thus, in total, before the fraud was exposed, Defendant Apt sold 129,249 shares of Company stock on inside information, for which he received approximately $2.7 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the schemes.

**Defendant Dilsaver**

39.     Defendant Dilsaver has served as a Company director since May 13, 2024. She also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee and the Audit Committee.

40.     The Company's website states the following about Defendant Dilsaver:

Evelyn Dilsaver is a prominent leader in both the public and nonprofit sectors, with experience in marketing, strategy, and business development. She spent nearly two decades in the audit and finance function as Controller for First Nationwide Bank, as well as Controller for Charles Schwab. Following, she went on to become Chief Financial Officer and Chief Administrative Officer for U.S. Trust, and later served as President and CEO of Charles Schwab Investment Management, where she grew assets to over $200 billion and generated over $1 billion in company revenue.

Today, Evelyn leverages her expertise and leadership in a variety of corporate and nonprofit Board roles, including Tempur Sealy (TPX), Health Equity (HQY), QuidelOrtho (QDEl), Bailard REIT, and the global consulting firm Proviti, in addition to PACS. She previously served as Board Chair for The Commonwealth Club, Board Chair for the Blue Shield of California Foundation, and Co-Chair of the Women Corporate Directors Advisory Board, as well as a Board member of Blue Shield of California, Long Drugs, Tamalpais, Bancorp, Aeropostale, High Mark Funds and the National Association of Corporate Directors, Northern California Chapter.

**Defendant Hancock**

41.     Defendant Hancock founded in the Company in 2013 and has served as its Executive Vice Chairman since January 1, 2024, and as the Company's Interim CFO since

September 2, 2025. Defendant Hancock previously served as CFO of the Company from January 2013 until January 2024. According to the 2025 Proxy Statement, Defendant Hancock beneficially owned 54,626,199 shares of the Company's common stock, representing 34.9% of the Company's voting power. As a result, Defendant Hancock is a controlling shareholder of the Company.

42.    During the Relevant Period, while the Company's stock price was artificially inflated and before the schemes were exposed, Defendant Hancock made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| April 11, 2024 | 1,607,142 | $21 | $33,749,982 |
| September 9, 2024 | 8,128,352 | $36.25 | $294,652,760 |

Thus, in total, before the fraud was exposed, Defendant Hancock sold 9,735,494 shares of Company stock on inside information, for which he received approximately $328.4 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the schemes.

43.    The Company's website states the following about Defendant Hancock:

Mark is the Executive Vice Chairman, former Chief Financial Officer and one of two founders/owners of PACS Group Inc., a rapidly growing national platform investing in the continuum of post-acute care, including post-acute care professionals, ancillary services, and 315 post-acute facilities in 17 states across the country. In addition to over 20 years of experience as a finance professional Mark has previously worked as a licensed nursing home administrator in Utah, California, and Kentucky

Prior to starting PACS, Mark worked for Fortune 500 companies in the auto and steel industries and as the treasurer for a $20 billion financial services company. Mark was named a 2023 Mountain West Entrepreneur of the Year by Ernst & Young and was a finalist for their national Entrepreneur of the Year competition that same year. He is a Certified Treasury Professional (CTP) and holds a bachelor's degree in engineering from Brigham Young University, as well as a

master's in business administration from Brigham Young University's Marriott School of Management.

When he's not focused on the skilled nursing industry, Mark enjoys spending time with his family, volunteering for his church, and expanding humanitarian efforts through his family's charitable foundation.

**Defendant Jergensen**

44.    Defendant Jergensen has served as the Company's President and COO since January 2023. Previously, Defendant Jergensen served as the Company's Executive Vice President of Operations from July 2014 to January 2023.

45.    During the Relevant Period, while the Company's stock price was artificially inflated and before the schemes were exposed, Defendant Jergensen made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| April 11, 2024 | 295,411 | $21 | $6,203,631 |

Thus, in total, before the fraud was exposed, Defendant Jergensen sold 295,411 shares of Company stock on inside information, for which he received approximately $6.2 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the schemes.

46.    The 2025 Proxy Statement stated the following about Defendant Jergensen:

**Joshua Jergensen** has served as our President and Chief Operating Officer since January 2023. Prior to that, Mr. Jergensen served as our Executive Vice President of Operations from July 2014 to January 2023. From October 2009 to July 2014, Mr. Jergensen was a nursing home administrator at Balboa Nursing and Rehabilitation Center, one of our affiliated skilled nursing facilities. Mr. Jergensen received a B.S. in Business Management with an emphasis in Finance from Brigham Young University and a Master of Healthcare Administration from the University of Southern California.

- 15 -

(emphasis in original)

**Defendant Leavitt**

47.    Defendant Leavitt has served as the Company's Lead Independent Director since July 2023. He also serves as the Chair of the Compensation Committee and as a member of the Nominating and Corporate Governance Committee and the Audit Committee.

48.    The Company's website states the following about Defendant Leavitt:

Taylor Leavitt is Managing Partner and CEO of Leavitt Equity Partners. He received an MBA from the UCLA Anderson School of Business and graduated magna cum laude from Utah State University with degrees in finance, economics, and international business. Taylor brings nearly 20 years of healthcare and finance experience and has been responsible for managing and executing the overall mission of LEP, its investment activities, and subsequent performance.

Before Leavitt Equity Partners, Taylor launched and led Leavitt Partners' (the consulting firm) Equity Practice which advised both private equity and hedge funds on healthcare investment opportunities and industry dynamics. Prior to joining Leavitt Partners, Taylor worked for ZARS Pharma, a venture capital funded pharmaceutical company, engaged in corporate acquisitions, licensing and business development operations. While at ZARS, he identified and executed strategic corporate transactions on a global basis, including mergers and acquisitions and IP and technology licenses.

Taylor enjoys spending time with his family, including supporting his four daughters' dance activities.

**Defendant Lewis**

49.    Defendant Lewis has served as the Company's Executive Vice President and CAO since January 2023.

50.    During the Relevant Period, while the Company's stock price was artificially inflated and before the schemes were exposed, Defendant Lewis made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| April 11, 2024 | 32,012 | $21 | $672,252 |

Thus, in total, before the fraud was exposed, Defendant Lewis sold 32,012 shares of Company stock on inside information, for which she received approximately $672,252 in proceeds. Her insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate her motive in facilitating and participating in the schemes.

51.   The Company's website states the following about Defendant Lewis:

Michelle has served as our Executive Vice President, Chief Accounting Officer since January 2023. Since joining our company in July 2018, Ms. Lewis served in various roles of increasing responsibility, including as our Controller. Prior to that, Ms. Lewis, who is licensed as a Certified Public Accountant, owned and operated Michelle Lewis Accounting Services, PLLC, a certified public accounting firm, and also provided controller functions at a privately held healthcare organization, from January 2008 to May 2015. Ms. Lewis received a B.S. in Business Administration from the California State University East Bay. She has worked in the skilled nursing industry in various functions since 1997.

Michelle is married with two adult children and two spoiled dogs. She enjoys traveling, long walks/hikes with her husband, a newfound interest in snowshoeing, watching crime documentaries and is an avid reader of all things fiction.

**Defendant Millard**

52.   Defendant Millard has served as a Company director since July 2023. She also serves as Chair of the Audit Committee and as a member of the Compensation Committee and the Nominating and Governance Committee.

53.   The Company's website states the following about Defendant Millard:

For nearly 29 years, Jacque Millard was the Vice President and Chief Investment Officer for Intermountain Healthcare where she led the investment department to invest more than $15 billion across multiple portfolios. Today, she is the Audit Committee Chair for PACS Group Inc. and Board Chair for FJI.

She is the former Board Chair for Youthlinc and has served on multiple endowment and foundation boards or investment committees, including Avent Health, Virginia Piper Trust, Westminster College, and Deseret Mutual Benefit Association. She is

also a member of the National Association of Corporate Directors (NACD) and has completed the Director Professionalism certification.

Jacque's mission, to enhance investment performance and improve governance, is embodied in her professional and personal life. She brings her skill sets to foundations, family offices, and private companies to make a positive impact on their mission.  She is personally committed to seeking places where she can make a significant impact in the board room.

**Defendant Sanford**

54.     Defendant Sanford was the Vice-President of Finance, and later the President of PACS Services, during the Relevant Period. Defendant Sanford resigned on August 15, 2025.

55.     During the Relevant Period, while the Company's stock price was artificially inflated and before the schemes were exposed, Defendant Sanford made the following sales of Company stock:

| Date | Number of Shares | Avg. Price/Share | Proceeds |
|---|---|---|---|
| April 11, 2024 | 147,724 | $21 | $3,102,204 |

Thus, in total, before the fraud was exposed, Defendant Sanford sold 147,724 shares of Company stock on inside information, for which he received approximately $3.1 million in proceeds. His insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the schemes.

*Former PACS Employees*

56.     The Securities Class Action captioned *Manchin v. Pacs Group, Inc. et al*, Case No: 1:24-cv-08636-LJL, in the United States District Court for the Southern District of New York, incorporates statements from former employees of PACS Group who offered their experiences as

confidential witnesses.[4] The following are the confidential witnesses whose statements are referenced throughout this complaint before this Court.

**FE-1**

57.    FE-1 was employed as a Director of Admissions at a PACS-owned SNF from November 2023 through August 2024.

**FE-2**

58.    FE-2 was an Assistant Regional Director of Clinical Services at a California PACS facility for several years during the Relevant Period. FE-2's responsibilities included overseeing approximately fifteen facilities and supervising five facilities.

**FE-3**

59.    FE-3 was a Business Officer Manager for a PACS SNF in California from October 2023 through August 2024. FE-3's responsibilities included overseeing accounts receivable, insurance payments, and medical claims for the facility.

**FE-4**

60.    FE-4 was a Director of Medical Records for an Arizona PACS facility from September 2024 through February 2025.

**FE-5**

61.    FE-5 was an Interim Executive Director at a Colorado PACS facility from March 2024 through October 2024.  FE-5's responsibilities included focusing on specific issues at a facility by learning its business, building, and other applicable issues, before moving to a different facility where he was needed. For example, FE-5 worked at a facility as its licensed administrator

---

[4] As was done in the Securities Class Action, all confidential witnesses are referred to in the masculine to preserve their anonymity.

until a new hire was ready to take over.

**FE-6**

62.     FE-6 was the Executive Director at an Arizona PACS facility from April 2024 through June 2024.

**FE-7**

63.     FE 7 was a Regional Marketing Director for PACS in 2024. FE-7's responsibilities included overseeing marketing and admissions for many PACS-owned SNFs in the Southwest region. He also assisted these facilities with marketing, boosting revenue, image, and connecting SNFs to hospitals.

**FE-8**

64.     FE-8 was the Director of Business Development at a Colorado PACS facility from April 2024 through April 2025. FE-8's responsibilities included increasing streams of revenue and admissions of patients, contracting healthcare providers for patient referrals, and communicating to patients' families when there were grievances.

**FE-9**

65.     FE-9 was an Administrator at a California PACS facility from the second half of 2023 through 2025. FE-9's responsibilities included overseeing the operations of the facility.

**FE-10**

66.     FE-10 was an administrator at an Arizona FACS facility from September 2023 through July 2025. FE-10's responsibilities included overseeing the management and operations of the facility.

<u>**FIDUCIARY DUTIES OF THE INDIVIDUAL DEFENDANTS**</u>

67.     By reason of their positions as controlling shareholders, officers, directors, and/or

fiduciaries of the Company and because of their ability to control the business and corporate affairs of the Company, the Individual Defendants owed the Company and its shareholders fiduciary obligations of trust, loyalty, good faith, and due care, and were and are required to use their utmost ability to control and manage the Company in a fair, just, honest, and equitable manner. The Individual Defendants were and are required to act in furtherance of the best interests of the Company and its shareholders so as to benefit all shareholders equally.

68.     Each controlling shareholder, director, and/or officer of the Company owes to PACS and its shareholders the fiduciary duty to exercise good faith and diligence in the administration of the Company and in the use and preservation of its property and assets and the highest obligations of fair dealing.

69.     The Individual Defendants, because of their positions of control and authority as controlling shareholders, directors, and/or officers of the Company, were able to and did, directly and/or indirectly, exercise control over the wrongful acts complained of herein or aided and abetted the same.

70.     To discharge their duties, the controlling shareholders, officers, and/or directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, controls, and operations of the Company.

71.     As controlling shareholders, senior executive officers, and/or directors of a publicly-traded company whose common stock was registered with the SEC pursuant to the Exchange Act and traded on the NYSE, the Individual Defendants at PACS had a duty to prevent and not to effect the dissemination of inaccurate and untruthful information with respect to the Company's financial condition, performance, growth, operations, financial statements, business, products, management, earnings, internal controls, and present and future business prospects,

including the dissemination of false information regarding the Company's business, prospects, and operations, and had a duty to cause the Company to disclose in its regulatory filings with the SEC all those facts described in this Complaint that it failed to disclose, so that the market price of the Company's common stock would be based upon truthful and accurate information. Further, they had a duty to ensure the Company remained in compliance with all applicable laws.

72.     To discharge their duties, the controlling shareholders, officers and/or directors of the Company were required to exercise reasonable and prudent supervision over the management, policies, practices, and internal controls of the Company. By virtue of such duties, the controlling shareholders, officers and/or directors of the Company were required to, among other things:

(a)     ensure that the Company was operated in a diligent, honest, and prudent manner in accordance with the laws and regulations of Delaware, Utah, and the United States, and pursuant to PACS' own Code of Conduct and Business Ethics (the "Code of Ethics");

(b)     conduct the affairs of the Company in an efficient, business-like manner so as to make it possible to provide the highest quality performance of its business, to avoid wasting the Company's assets, and to maximize the value of the Company's stock;

(c)     remain informed as to how the Company conducted its operations, and, upon receipt of notice or information of imprudent or unsound conditions or practices, to make reasonable inquiry in connection therewith, and to take steps to correct such conditions or practices;

(d)     establish and maintain systematic and accurate records and reports of the business and internal affairs of the Company and procedures for the reporting of the business and internal affairs to the Board and to periodically investigate, or cause independent investigation to be made of, said reports and records;

(e)      maintain and implement an adequate and functioning system of internal legal, financial, and management controls, such that the Company's operations would comply with all applicable laws and the Company's financial statements and regulatory filings filed with the SEC and disseminated to the public and the Company's shareholders would be accurate;

(f)      exercise reasonable control and supervision over the public statements made by the Company's officers and employees and any other reports or information that the Company was required by law to disseminate;

(g)      refrain from unduly benefiting themselves and other Company insiders at the expense of the Company; and

(h)      examine and evaluate any reports of examinations, audits, or other financial information concerning the financial affairs of the Company and make full and accurate disclosure of all material facts concerning, *inter alia*, each of the subjects and duties set forth above.

73.      Each of the Individual Defendants further owed to the Company and its shareholders the duty of loyalty requiring that each favor the Company's interest and that of its shareholders over their own while conducting the affairs of the Company and refrain from using their position, influence, or knowledge of the affairs of the Company to gain personal advantage.

74.      At all times relevant hereto, the Individual Defendants at PACS were the agents of each other and of the Company and were at all times acting within the course and scope of such agency.

75.      Because of their advisory, executive, managerial, directorial, and controlling positions with the Company, each of the Individual Defendants had access to adverse, non-public information about the Company.

76.      The Individual Defendants, because of their positions of control and authority, were

able to and did, directly or indirectly, exercise control over the wrongful acts complained of herein, as well as the contents of the various public statements issued by the Company.

## CONSPIRACY, AIDING AND ABETTING, AND CONCERTED ACTION

77.     In committing the wrongful acts alleged herein, the Individual Defendants have pursued, or joined in the pursuit of, a common course of conduct, and have acted in concert with and conspired with one another in furtherance of their wrongdoing. The Individual Defendants caused the Company to conceal the true facts as alleged herein. The Individual Defendants further aided and abetted and/or assisted each other in breaching their respective duties.

78.     The purpose and effect of the conspiracy, common enterprise, and/or common course of conduct was, among other things, to: (i) facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, waste of corporate assets, gross mismanagement, abuse of control, and violations of the Securities Act and Exchange Act; (ii) conceal adverse information concerning the Company's operations, financial condition, legal compliance, future business prospects, and internal controls; and (iii) artificially inflate the Company's stock price.

79.     The Individual Defendants accomplished their conspiracy, common enterprise, and/or common course of conduct by causing the Company purposefully or recklessly to conceal material facts, fail to correct such misrepresentations, and violate applicable laws. In furtherance of this plan, conspiracy, and course of conduct, the Individual Defendants collectively and individually took the actions set forth herein. Because the actions described herein occurred under the authority of PACS' board of directors, each of the Individual Defendants who was a director of PACS was a direct, necessary, and substantial participant in the conspiracy, common enterprise, and/or common course of conduct complained of herein.

80. Each of the Individual Defendants aided and abetted and rendered substantial assistance in the wrongs complained of herein. In taking such actions to substantially assist the commission of the wrongdoing complained of herein, each of the Individual Defendants acted with actual or constructive knowledge of the primary wrongdoing, either took direct part in or substantially assisted the accomplishment of that wrongdoing and was or should have been aware of his or her overall contribution to and furtherance of the wrongdoing.

81. At all times relevant hereto, each of the Individual Defendants was the agent of each of the other Individual Defendants and/or of the Company and was at all times acting within the course and scope of such agency.

## PACS' CODE OF ETHICS

82. PACS represents that its Code of Ethics "serves as a guiding framework for our actions and decisions" and "helps to ensure that we conduct our business in an honest, ethical, and compliant manner, meeting all applicable clinical and other standards." The Code of Ethics also notes that it "applies to everyone at PACS, including [] all PACS-affiliated facilities and businesses and their respective employees, and contract workers, as well as all Company officers, and the Board of Directors."

83. Under the heading titled "A Letter from Our CEO and CCO," the Code of Ethics states, in relevant part:

> We expect every member of the PACS family, including employees, contract workers, volunteers, officers, and the Board of Directors, to be familiar with the standards outlined in this Code. It is crucial that you understand how these standards apply to your role and responsibilities. Should you have any questions or require guidance, please do not hesitate to reach out to your supervisor, any member of PACS management, or the Compliance Department. Our Compliance Hotline is also available 24/7 at pacs.ethicspoint.com, via email at compliance@pacs.com, or by calling (833) 718-4953.

84.     Under the heading titled "Legal and Regulatory Compliance," the Code of Ethics states, in relevant part:

Our Compliance Program represents a comprehensive effort to promote ethical and legal behavior. While detecting and preventing fraud, waste, abuse, and policy violations are key components of our Compliance Program, we also aim to provide employees with resources to help guide your conduct and answer your questions. To promote our compliance efforts, we established processes and procedures aimed at ensuring we provide care to residents and patients, and otherwise conduct our business, in an honest and ethical manner, meeting all applicable clinical and other standards. We also have an Executive Compliance Committee that oversees our Compliance Program and supports our Chief Compliance Officer who reports to our Board of Directors. This Code is in addition to and provides an over-arching framework for our Employee Handbook and our other Policies and Procedures, all of which are part of our Compliance Program (in the event of an inconsistency between those policies and procedures and the Code, the Code shall prevail).

***

**Compliance with the Law**

We are reimbursed for many services rendered to our residents and patients under various federal and state programs and, as such, are subject to a variety of regulations and requirements imposed by federal and state legislation designed to prevent and address fraud and abuse, and recover losses resulting from fraudulent activity. We are committed to complying with all health, safety, environmental and employment laws. Our Policies and Procedures are written in accordance with these laws, and never supersede legal requirements.

**Preventing Fraud, Waste and Abuse**

We are committed to detecting and preventing fraud, waste and abuse. We have developed and implemented Policies and Procedures designed to ensure compliance with the laws that govern our operations as a healthcare provider. In addition to written Policies and Procedures, we provide education and training to employees, agents and contractors on fraud, waste and abuse, including applicable false claims laws, such as the federal False Claims Act and similar state laws.
The federal False Claims Act applies to Medicare and Medicaid program reimbursement and prohibits, among other things: billing for services not rendered; billing for undocumented services; falsifying cost reports; billing for medically unnecessary services; assigning improper codes to secure reimbursement or higher reimbursement; participating in kickback arrangements; and not refunding known overpayments.

Violating the federal False Claims Act may result in significant civil and

administrative penalties. The submission of false or fraudulent claims may also result in monetary penalties, imprisonment, exclusion from participation in federal healthcare programs and loss of licensure.

(emphasis in original)

85.     Under the heading titled "Legal and Regulatory Compliance," under the subheading "Insider Information and Securities Trading," the Code of Ethics states:

Trading on inside information is a violation of federal securities law. During the normal course of business or clinical activities, PACS employees may become aware of material non-public information about the Company or companies with whom we do business. Material information is information of such importance that it could influence a potential investor's decision to buy, sell or hold PACS securities or the securities of other publicly traded companies. This information, which can include details about mergers and acquisitions, financial results, business strategy, changes in executive management, and the like, should never be discussed with anyone outside of the Company and should only be used on a "need to know" basis with PACS colleagues.

Employees who receive material inside information about the Company or other publicly traded companies we do business with may not trade (which includes buying, selling, transferring, or gifting) the respective company's securities until the information is public. To use non-public information for personal financial benefit or to "tip" others, including family members, who might make an investment decision based on this information is not only unethical but also illegal under Federal law.

86.     Under the heading titled "Legal and Regulatory Compliance," under the subheading titled "Disclosures," the Code of Ethics states:

The information in the Company's public communications, including all reports and documents filed with or submitted to the SEC, must be full, fair, accurate, timely and understandable.

To ensure the Company meets this standard, all officers, directors, and other employees (to the extent they are involved in the Company's disclosure process) are required to maintain familiarity with the disclosure requirements, processes, and procedures applicable to the Company commensurate with their duties. All officers, directors and other employees are prohibited from knowingly misrepresenting, omitting, or causing others to misrepresent or omit, material facts about the Company to others, including the Company's independent auditors, governmental regulators, and self-regulatory organizations.

87.     Under the heading titled "Employee Matters and Workplace Conduct," the Code of Ethics, in relevant part, states:

**Conflicts of Interest**

A conflict of interest exists if you have an interest that interferes, or appears to interfere, with your responsibilities at work or may affect your judgment when working on behalf of the Company. A conflict of interest may also exist if a member of your family receives an improper benefit as a result of your position at the Company. Our employees have a responsibility to put the interests of the Company and our residents and patients ahead of any other business or personal interests. Our employees should not engage in any activities that actually or potentially conflict with the Company's interests.

This Code does not attempt to describe all possible conflicts of interest that could develop. A few examples of potential conflict of interest situations may include:

•       An employee accepts outside employment from, or contracts with, an organization that does business with us or is a competitor of ours. While certain employees, such as nurses, therapists, and CNAs, are not prohibited from working shifts at another facility, this additional work must be disclosed to supervisors and should not interfere with the employee's work commitment to the Company or interfere with the employee's job performance at the Company.
•       An employee or relative has a material financial interest in a firm that does business with the Company.
•       An employee is related to another employee, particularly an employee who they report to or supervise.
•       An employee receiving compensation, in any form, from any source other than the Company for services he or she performed for the Company.
•       An employee taking up a management or other employment position with any firm or company that is in direct or indirect competition with the Company.

Potential conflicts of interest must be disclosed to supervisors upon hire or as they occur. Any material changes in the nature of conflict-of-interest situations after they are approved must also be reported. All reported conflicts must be reviewed by the Legal Department and approved by the Compliance Department. This includes any additional employment accepted while working for the Company if it presents an actual or potential conflict of interest. Potential conflicts of interest that are not approved by the Compliance Department may subject the individual to appropriate discipline by Human Resources, up to and including termination of employment, taking into account appropriate and relevant facts. When in doubt, it is best to disclose an actual or potential conflict of interest. All transactions that could give

rise to a conflict of interest involving a director, executive officer or principal financial officer must be approved by the disinterested directors of the Board or a committee of the Board, and such approval will not be considered a waiver of this Code.

(emphasis in original)

88.    Under the same heading, in a subheading titled "Fair Dealing," the Code of Ethics states:

All officers, directors and other employees should endeavor to deal fairly with the Company's customers, service providers, suppliers, competitors, and employees. No officer, director or other employee may take unfair advantage of anyone through manipulation, concealment, abuse of privileged information, misrepresentation of material facts, or any unfair dealing practice.

89.    Under the heading titled "Employee Obligations and Acknowledgement," in a subheading titled "Your Obligation to Report," the Code of Ethics states:

Reporting your concerns is important to the effectiveness of our Compliance Program. Under our Code of Conduct, you are required to report sincere concerns that fall within any of the following categories:

• Abuse or neglect of any resident or patient;
• Violations of federal or state laws or regulations regarding resident or patient care;
• Violations of federal or state laws or regulations regarding participation in Medicare, Medicaid, or other healthcare programs;
• Activities that otherwise violate applicable laws or regulations; and/or
• Activities that violate this Code of Conduct, our employee handbook, or any of our other policies and procedures. Furthermore, it is never acceptable to overlook or ignore actual or suspected wrongdoing.

90.    Under the heading "Consequences of Non-Compliance," the Code of Ethics states:

Failure to comply with laws and regulations may lead to serious consequences for you, your coworkers and to the Company. These consequences may include, among other things, termination of employment, licensure actions, individual lawsuits, government investigations and prosecutions, prison, fines against you and the Company, exclusion from working in healthcare or otherwise participating in state and federal healthcare programs, loss of credibility and loss of respect. Because failure to comply with laws and regulations can lead to serious consequences, disciplinary action up to and including termination of employment, will be taken against any employee for:

- 29 -

• Participating in or authorizing any violation of laws, regulations, our Code of
Conduct or our policies and procedures
• Failing to report violations
• Concealing violations
• Refusing to cooperate with an internal investigation
• Threatening or retaliating against someone who reports a violation.

91.     In violation of the Code of Ethics, the Individual Defendants conducted little, if

any, oversight of the Company's engagement in the Individual Defendants' schemes to engage in

the Billing Misconduct, Patient Neglect Misconduct, Licensing and Certification Misconduct, and

the Medical Record Misconduct and to issue materially false and misleading statements to the

public and to facilitate and disguise the Individual Defendants' violations of law, including

breaches of fiduciary duty, gross mismanagement, abuse of control, waste of corporate assets, and

violations of the Securities Act and the Exchange Act. Additionally, in violation of the Code of

Ethics, the Individual Defendants failed to maintain internal controls, failed to obtain waivers

and/or failed to disclose obtained waivers of violating the Code of Ethics, and failed to comply

with laws and regulations, conduct business in an honest and ethical manner, and properly report

violations of the Codes of Ethics.

## PACS' AUDIT COMMITTEE CHARTER

92.     PACS also maintains an Audit Committee Charter (the "Audit Committee

Charter") which defines the purpose of the Audit Committee as follows:

The purpose of the Audit Committee (the "Committee") is to assist the Board in its
oversight of: (i) the integrity of the Company's financial statements; (ii) the
Company's compliance with legal and regulatory requirements; (iii) the
independent auditor's qualifications and independence; and (iv) the performance of
the Company's internal audit function and independent auditor. The Committee's
responsibilities are limited to oversight. The Company's management is
responsible for establishing and maintaining accounting policies and procedures in
accordance with generally accepted accounting principles ("GAAP") and other
applicable reporting and disclosure standards and for preparing the Company's

financial statements. The Company's independent auditors are responsible for auditing and reviewing those financial statements.

93.     Under the heading "Duties and Responsibilities," in the subsection titled "Annual Financial Statements and Annual Audit," the Audit Committee Charter states:

*Audit Problems*. The Committee must discuss with the independent auditor any audit problems or difficulties and management's response.

*Form 10-K Review*. The Committee must review and discuss with management and the independent auditor the annual audited financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations" and recommend to the Board whether the audited financial statements should be included in the Company's Form 10-K.

94.     Under the same heading, in the subsection titled "Quarterly Financial Statements," the Audit Committee Charter states:

*Form 10-Q Review*. The Committee must review and discuss with management and the independent auditor the Company's quarterly financial statements, including the Company's disclosures under "Management's Discussion and Analysis of Financial Condition and Results of Operations."

95.     Under the same heading, in the subsection titled "Other Duties and Responsibilities," the Audit Committee Charter states, in relevant part:

*Review of Earnings Releases*. The Committee must discuss the Company's earnings press releases, as well as financial information and earnings guidance provided to analysts and rating agencies.

*Risk Assessment and Risk Management*. The Committee must discuss the Company's policies with respect to risk assessment and risk management and oversee the management of the Company's financial risks and information technology risks, including cybersecurity and data privacy risks. The Committee must discuss with management the steps management has taken to monitor and control these risks.

\*\*\*

*Complaint Procedures*. The Committee has approved the procedures set forth in the Company's Policies and Procedures for Complaints Regarding Accounting,

Internal Accounting Controls, Fraud or Auditing Matters ("Whistleblower Policy") for the receipt, retention and treatment of complaints received by the Company regarding accounting, internal accounting controls or auditing matters, and for the confidential and anonymous submission by Company employees of concerns regarding questionable accounting or auditing matters.

*Review of Internal Control Over Financial Reporting*. The Committee must review and discuss with management and the independent auditor the adequacy of the Company's internal control over financial reporting ("ICFR") and any steps management has taken to address material weaknesses in ICFR.

*Review of Related Person Transactions*. The Committee will periodically review the Company's policies and procedures for reviewing and approving "related person transactions" as defined by Item 404 of Regulation S-K and approve or recommend to the Board any changes to such policies and procedures. In accordance with the Company's Related Person Transaction Policy and Procedures and NYSE rules, the Committee will review and, if appropriate, approve related person transactions and oversee such transactions on an ongoing basis

*Review of Code of Business Conduct and Ethics.* The Committee must periodically consider and discuss with management and the independent auditor the Company's Code of Business Conduct and Ethics (the "Code") and the procedures in place to enforce the Code. The Committee must also consider and discuss and, as appropriate, grant requested waivers from the Code brought to the attention of the Committee; provided that the Committee may defer any decision with respect to any waiver to the Board.

*Reports to the Board of Directors*. The Committee must report regularly to the Board regarding the activities of the Committee

96.    In violation of the Audit Committee Charter, the Individual Defendants (as key officers, directors, and controlling shareholders) conducted little, if any, oversight of the Company's engagement in the Individual Defendants' scheme to issue materially false and misleading statements to the public and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, gross mismanagement, abuse of control, waste of corporate assets, and violations of the Securities Act and Exchange Act. Moreover, in violation of the Audit Committee Charter, the Individual Defendants failed to maintain the accuracy of the Company's records and reports, comply with laws and regulations,

act in good faith and diligence without misstating, misrepresenting, or omitting material facts, and properly report violations of the Audit Committee Charter.

## INDIVIDUAL DEFENDANTS' MISCONDUCT

### *Background of PACS*

97.    PACS was founded in 2013 and is one of the largest NF and post-acute care facilities operators in the United States. Incorporated in Delaware and headquartered in Salt Lake City, Utah, PACS currently operates in 16 states and has approximately 280 facilities that serve over 27,000 patients each day.

98.    SNFs are facilities that help patients recover from injuries, health conditions, surgeries, and illnesses by providing 24-hour support and services. SNFs support patients with complex medical needs such as providing rehabilitation services. SNFs are staffed by at least one licensed administrator, a Director of Nursing, licensed nurses, and specialized therapists.

99.    PACS set itself apart from its competitors by acquiring underperforming SNFs and implementing changes to improve their financial performance. The Company has a main operating subsidiary named PACS Services. PACS Services assist the Company's facilities by offering "a comprehensive suite of services to assist PACS facilities in "achieving their best clinical and operating potential." PACS Services offer accounting, finance, human resources, payroll, accounts receivable and payable, legal, compliance, risk management, and technology tools to PACS' facilities. PACS Services was run by Defendant Sanford during the Relevant Period, who reported directly to Defendants Murray and Hancock. The Company's administrators reported to PACS' regional vice presidents who in turn reported to Defendant Sanford.

100.    PACS' revenue is heavily reliant on government funded programs such as Medicare and Medicaid. In 2022 and 2023, Medicare and Medicaid accounted for over 70% of PACS' total

revenue. In 2022, Medicare made up 47.6% of PACS' revenue and Medicaid made up 30.2% of PACS' revenue. In 2023, Medicare made up 38.6% of PACS' revenue and Medicaid made up 37.6% of PACS' revenue.

101.   However, the payment PACS receives from Medicare can increase depending on whether PACS is treating beneficiaries who require a higher level of skilled care. The Center for Medicare and Medicaid Services ("CMS") defines a higher level of skilled care service as services like nursing or rehabilitation that "require the skills of qualifies technical or professional health personnel." PACS states that patients who receive a higher level of care drive its financial sustainability while lower-acuity patients result in lower payments.

102.   Medicare beneficiaries who require a higher level of skilled care can drive up to three times more revenue per day than Medicaid for a SNF. Typically, in order for a patient to qualify as needing a higher level of skilled care under Medicare the patient must typically "have spent a minimum of three consecutive inpatient days in the hospital." During the COVID-19 pandemic, the CMS waived this requirement in order to reduce hospital overcrowding, allowing patients to access Medicare Part A benefits if the patient showed a need for skilled nursing care. However, under the COVID Waiver, potential COVID exposure and even a positive COVID test result did not qualify the patient for higher skilled care benefits, since the COVID Waiver required skilled medical necessities such as ventilator weaning or intensive monitoring in order to use the COVID Waiver.

103.   From 2021 to 2023 PACS more than doubled its net income, from $47 million to almost $112 million as a result of the COVID Waiver which placed the Company at the forefront of the SNF market. However, when the COVID Waiver expired in May 2023, PACS' revenue sharply declined. To mask this sharp decline and to attempt to get back to COVID era levels of

profitability, PACS began fraudulently billing for unnecessary treatments and for services never provided to patients.

104.    On March 13, 2024, PACS filed its the IPO Registration Statement which was later declared effective on April 10, 2024. On April 12, 2024, PACS filed the IPO Prospectus with the SEC. In connection with the IPO, PACS issued 21,428,572 shares of common stock at $21.00 per share which netted the Company proceeds of $450 million.

105.    On September 3, 2024, PACS filed the SPO Registration Statement with the SEC and on September 6, 2024, PACS filed the SPO Prospectus with the SEC. During the SPO, PACS issued 2,777,778 shares of common stock at $36.25 per share which netted the Company $100.7 million in proceeds. Through the SPO, Defendants Murray and Hancock sold 16,256,704 shares of common stock at $26.25 per share for proceeds of $589.3 million.

### The COVID Waiver Misconduct

106.    The Individual Defendants caused the Company to engage in the COVID Waiver Misconduct as even though the COVID Waiver required a showing of skilled medical necessity, numerous PACS facilities would use improper justifications, such as a single positive COVID test, to "flip" a patient from Medicaid to Medicare under the COVID Waiver.[5]

107.    For example, FE-1 stated that his facilities would flip patients from their existing insurers to Medicare without patients' consent, permission, or knowledge. FE-1 further stated that many patients "did not want to switch to Medicare" because of co-pays associated with Medicare after 20 days. FE-1 also commented that patients who were incapacitated would be flipped to Medicare without informing family members and/or Power of Attorney holders. According to FE-

---

[5] The COVID Waiver Misconduct is explained in further detail in the section titled "The Truth Emerges" set forth below.

1, some patients and their families would not find out that they had been flipped to Medicare until months after, usually after receiving a letter in the mail. This caused several families to complain to FE-1, but despite numerous complaints, patients were continuing to be flipped to Medicare. Further, FE-1 stated that if employees did not flip patients to Medicare, "you were let go."

108.    FE-10 also saw many instances of patient flipping to maximize billing to Medicare. FE-10 detailed that when patients with Medicare Part A coverage expired, they would be switched to Medicare Part B, at which point the patient had to apply Medicaid to cover room and board expenses while also receiving part B services

### *Respiratory Billing Misconduct*

109.    Once the COVID Waiver expired on May 11, 2023, the Individual Defendants began to cause the Company to engage in the Respiratory Billing Misconduct by causing the Company to wrongly bill Medicare Part B for improper revenue from unnecessary or not provided treatments by respiratory therapists.[6]

110.    For example, FE-9 stated that Company administrators encouraged unnecessary respiratory treatments which "felt like a ponzi scheme," and that it was done to "fill the gap" left by the expiration of the COVID Waiver.  According to FE-9, billing for respiratory therapies became one of the Company's largest revenue streams and the Company's respiratory therapists were incentivized to get "everyone" on respiratory therapy. Further, FE-9 stated that bonuses were given to respiratory therapists depending on how much revenue they generated from respiratory therapies. Additionally, FE-5 stated that Company administrators would be fired if they did not push for additional respiratory therapies.  FE-6 also stated that they were fired shortly after not

---

[6] The Respiratory Therapy Misconduct is explained in further detail in the sections titled "The Truth Emerges" and "Subsequent Developments" set forth below.

providing unnecessary respiratory therapy to patients.

111.    FE-9's smaller-sized facility generated $70,000 to $80,000 per month from respiratory therapies alone while facilities with 99 beds would earn $100,000 per month. FE-9 elaborated that "test buildings" were used to test new therapies to bill to patients, and a Company regional vice president would track the test building numbers closely in order to see if the buildings were being reimbursed by Medicare for the therapies.

112.    FE-3 also noted that prior to the new billing practices beginning in May 2023, respiratory therapy had always been included in the Company's skilled nursing services. FE-3 elaborated that he was on emails and attended video conferences led by "Corporate Level management" which pushed for respiratory therapies to be billed under Medicare Part B. For example, FE-3 attended a Zoom meeting in May 2023 attended by corporate-level clinical nurses, Administrators, business office staff, accounts receivable consultants, Directors of Nursing, and MDS Coordinators. During the meeting, a PACS employee told attendees to perform respiratory therapies and explained how to bill for it. FE-3 also stated that he received spreadsheets discussing how to and how much to bill for various treatments, but he was given little information as to justify specific treatments.

113.    FE-10 also attended a Zoom meeting discussing respiratory therapy billing practices. FE-10 noted that he attended a training on how to bill Medicare, where he was told that 15 minutes of respiratory therapy could be billed at a set rate" and increase Company revenue. FE-10 elaborated that the meeting discussing documenting practices for "breathing treatments such as cupping," even if the treatments were not actually performed.

114.    FE-5 also attended a four-hour lecture in May 2024 attended by all Company administrators and Regional Vice Presidents within Colorado and was hosted by a Company

administrator. During the May 2024 meeting, were presented on how to increase billing for respiratory therapies, such as billing in excess of regulatory caps by using different billing codes. The Company administrator told attendees to bill "this way," and code "that way," in order to pass audits. FE-5 further explained that even though Colorado Medicaid regulations only paid for three respiratory treatments per patient per day, Company administrators were pressured to provide ten respiratory treatments per patient per day. FE-1 corroborated this story, stating that one therapist was pushed to perform respiratory therapies on twelve to fifteen patients a day.

115.    PACS' former employees also recalled specific instances where patients were billed for unnecessary respiratory therapies. FE-1 stated that he heard a respiratory therapist tell a SNF administrator that he was following his instructions by performing unnecessary respiratory therapies. FE-1 additionally stated detailed how his facility was training licenses vocational nurses to perform respiratory therapies on patients who did not need it in order to increase Company revenue. FE-6 stated that a PACS regional Vice President in Arizona pushed respiratory therapies for all of his patients, regardless of their need.

### Sensory Therapy Misconduct

116.    Starting in its first fiscal quarter of 2024 and continuing through the second fiscal quarter of 2024, the Individual Defendants caused the Company to engage in the Sensory Therapy Misconduct by wrongly billing Medicare Part B for unnecessary sensory therapies and the setup of sensory rooms.[7] For example, FE-10 commented that a Regional Vice President for the Company informed him that if a patient used a "sandbox or sensory wheel" for 15 minutes, it could be billed to Medicare. FE-10's facility already had a dementia care unit which conducted such

---

[7] The Sensory Therapy Misconduct is explained in further detail in the section titled "The Truth Emerges" set forth below.

activities, so he viewed the sensory rooms as unnecessary and that it was another way to bill for services already part of basic care. Additionally, a regional vice president of the Company told FE-10 to use a mobile cart to make a sensory room as FE-10's facility lacked the space needed to set up a dedicated sensory therapy room.

### *Regeneration and Census-Maximizing Misconduct*

117. Former employees also recalled how the Individual Defendants caused the Company to engage in the Regeneration Misconduct by sending patients to the hospital for a few days and then re-admitting the patient back into the PACS facility. This caused the patients' Medicare coverage to restart, boosting the Company's revenues as Medicare paid more than other insurances or private pay. FE-9 stated that a Company administrator called him numerous times, instructing him to regenerate patients. FE-9 also recalled how the same Company administrator instructed FE-9 to speak to his facilities marketer, so he could determine which patients to regenerate. FE-9 described how re-admitting patients "with a slight cough or having thoughts of suicide" was one way that the Company regenerated patients.

118. FE-10 recounted that when the Individual Defendants could not find ways to regenerate patients, employees were pressured to extend patient stays, including discouraging staff from discussing discharges with patients.

119. FE-1 recalled an instance where staff gave Frappucinos to patients, causing the patient's blood sugar to spike, which gave the facility an excuse to keep the patient for monitoring. FE-1 further stated that even if a patient was ready and wanted to leave his facility, his facility would come up with any excuse to keep the patient for longer. FE-1 described that his facility would admit "anyone" as long as "they had Medicare and a pulse." He was even "forced" to take in patients who were covered by Medicare even if they were homeless, drug addicts, mentally ill,

violent, or otherwise could not be properly treated or were dangerous to others. FE-10 elaborated that patient admissions were "encouraged" regardless of the patients' needs and was told by PACS "leadership" to "do whatever you can to secure the sale."

120.    FE-9 stated that Company administrators were pressured to maintain census rates above 95%, and if they dropped below that threshold, a Company Regional Vice President would instruct them to regenerate more patients or offer bonuses to markets if they increased admissions.

### Other Deceptive Billing Misconduct

121.    Former employees also expressed how the Individual Defendants caused the Company to inflate its revenue through other Medicare billing practices.

122.    For example, FE-2 stated that PACS facilities would bill for therapies that were either not needed or not provided. FE-2 described an instance where he saw a patient on physical therapy moving faster than the nurses. FE-1 described practices where patients would isolate patients when it was not medically necessary, since isolated patients had higher payouts by Medicare.

123.    FE-10 commented how sometimes treatments were performed but were billed at a different length or frequency. He further commented on instances where treatments were documented and billed, but the associated treatment was never performed. FE-9 recalled how a Company Regional Vice President stated, "you can bill for respiratory therapy twice a day, and you can do the same with sensory therapy for the purpose of maximizing revenue."

124.    FE-9 disclosed how a Company regional vice president taught Company administrators how to bill for multiple therapy sessions a day with overlapping therapy medical codes. He also stated that a Company regional vice president stated, "you can bill for respiratory therapy twice a day, and you can do the same with sensory therapy for the purpose of maximizing

revenue." FE-9 further stated that he saw billing records showing identical diagnoses and repeated therapy entries.

125.  FE-4 also commented on instances where patients and insurers were billed for prescriptions or therapies that were never given. FE-4 stated sometimes patients would receive medications without any documentation or proof that the treatments were authorized by a doctor. He further stated that some patients were billed for treatments dated after the patient had left the facility.

### *The Patient Neglect Misconduct*

126.  Former employees also described how the Individual Defendants allowed the Company to neglect its patients. For example, FE-4 received numerous complaints from family members regarding patient mistreatment. FE-4 recalled one instance where a patient died from an infected wound which could have been prevented through normal care. There were also instances of patients being left when screaming for help, patients not being cleaned when they soiled themselves, and Company employees screaming at residents. FE-4 conveyed these concerns to others, but no changes were made.

### *The Licensing and Certification Misconduct*

127.  Former employees also recounted how the Individual Defendants allowed the Company to violate state licensing and certification laws.[8] States require SNF's to be run by licensed individuals, however, the Individual Defendants circumvented this requirement through a process called "hanging." Hanging is when a facility is "run" by an absent licensed administrator in another jurisdiction. This was done since unlicensed individuals would be more likely to follow

---

[8] The Licensing and Certification Misconduct is explained in further detail in the section titled "The Truth Emerges" set forth below.

the Individual Defendants' scheme to engage in illegal billing practices as unlicensed individuals are less knowledgeable than licensed individuals when it comes to regulations and an unlicensed individual would not be concerned with losing their license to practice.

128.    In California, all SNF's are required to be run by a licensed individual, and the licensed individuals are not allowed to run more than three facilities or a total of no more than 200 beds at one time.[9] Specifically, FE-2 identified at least seven Company administrators who hanged their license in violation of California state law. FE-2 explained that the individuals who hanged their license were not caught since each location was in a different public health jurisdiction, and the different districts did not cross-check with one another. FE-6 likened this practice to musical chairs, shifting administrator licenses around so each facility can continue to operate.

129.    FE-9 recalled how he was running his facility a year before he received his Nursing Home Administrator license. FE-9 states that there was a "lot of illegal" practices with licenses at the Company's facilities.

130.    Arizona law only allows an administrator to run more than one SNF if the two facilities are no more than 25 miles apart and the appointment of another administrator is no for no more than 90 days.[10] FE-10 stated that he was required to oversee two facilities for almost a year, and had his license used for another building well past the ninety-day limit.

131.    Colorado Law requires all SNFs to have a full-time administrator with no other conflicting employment basis, and that administrator must be responsible on a 24-hour-a-day basis.[11] FE-5 detailed that regional-level employees would obtain licenses to put on buildings and

---

[9] See Cal. Code Regs. Tit. 22, § 72513(a)(2).
[10] See Ariz. Admin. Code § R4-33-212.
[11] See Col. Reg. Code § 8.405.50.

in one instance a regional maintenance supervisor obtained a license to put on a PACS facility, yet the individual was never actually present at the building and later left the Company.

### The Medical Record Misconduct

132.    Former employees also expressed concerns of the Individual Defendants allowing the Company and its employees to violate laws regarding medical records. The law requires patients, or a person with power of attorney for the patient, to sign a Consent to Treatment form before the patient is admitted into the SNF or any treatment can be provided. FE-4 noticed over 100 times when a Consent of Treatment form was not signed by the patient or their power of attorney. FE-4 expressed his concerns to his superiors, but nothing was done.

133.    FE-4 also observed Company employees signing forms for patients after they had been admitted. FE-4 knew this was illegal, and reported this to his administrator, but nothing was done. FE-4 saw other instances of paperwork not being properly done, including Medicare and Medicaid reimbursement requests. Medicaid and Medicare reimbursement requests are required to be signed by doctors or nurses. However, FE-4 noticed thousands of unsigned reimbursement requests, with one doctor alone having 15,000 forms waiting for his signature when he left PACS.

### The Individual Defendants had Insider Knowledge to Circumvent State Audits

134.    Former employees also noted that Company employees had insider information which allowed them to have advanced notice of state inspections or audits. For example, FE-2 stated that a Company employee had a relationship with a California survey who would provide the Company employee with advanced notice of state visits of the Company facilities. FE-2 further stated that the Company employee would alert the Company facility so it could review records and make changes before the inspection.

### The Individual Defendants Rewarded Wrongdoers

135.    Former employees commented on how the Individual Defendants would allow employees who participated in the misconduct to participate in luxury trips and misuse Company credit cards for personal expenses. For example, FE-9 recalled how Company administrators went on trips where to places such as Palm Springs, Las Vegas, and St. George where employees would golf and gamble for days only to have a one-hour meeting on how to make PACS more money. FE-9 also recalled how Company administrators in the Southwest region and other regions would use PACS credit cards to pay for hotels and entertainment. FE-9 further stated that misuse of Company credit cards was common knowledge where Company administrators discussed how they bought items such as Louis Vuitton purses and event tickets. FE-9 discussed how the Company marketers bought expensive gifts for hospital and case managers until they were threatened with a lawsuit.

136.    FE-1 stated that the misuse of Company credit cards was not restricted to Company administrators, as the Company's marketing employees were issued Company credit cards where employees could buy whatever they wanted even if it was not a business expense. FE-1 further stated that there were no consequences for misuse of the Company's credit cards.

137.    FE-9 also detailed how PACS' regional managers held stock values at around $150 million through an Evergreen Fund which could be distributed to Company administrators and marketers. FE-9 noted that Company administrators could choose which employees received stock and in one instance the Company administrator did not want to give stock to a Company marketer because she "wasn't playing the game."

138.    FE-2 further noted that Company administrators were rewarded by engaging in the Billing Misconduct as the more revenue the administrator generated for his SNF, the higher their bonus would be.

***Employees Who Did Not Engage in the Misconduct Were Terminated***

139.     Former employees also commented on how the Individual Defendants fostered an environment where employees were terminated for not engaging in the misconduct. For example, FE-1 stated that employees did not refuse questionable instructions due to receiving "pressure" from the top.  Additionally, FE-8 stated that employees were seen as 'disposable" if they were not close to a Company administrator. He further stated that there had been "a lot" of terminations since FE-8 took over his facility, some of which resulted in wrongful termination lawsuits.

140.     FE-6 commented how he was fired shortly after refusing to provide therapies only to patients who needed it.

141.     FE-7 was also aware of the termination of an employee who reported misconduct of a Company administrator in the southwest. Specifically, the employee raised several concerns to a Company regional vice president, including a detailed email explaining the employee's concerns. FE-7 stated that the Company administrator later found out about the complaints, and the employee was subsequently fired because the Company's regional vice president did not want to fire the administrator as they had an administrator license. FE-7 further commented on how the same Company regional vice president pressured a Company administrator to fire his respiratory director because he was not billing enough respiratory therapies. The Company administrator refused to terminate the respiratory director, which led the regional vice president to terminate the Company administrator instead. FE-7 also recalled how the same regional vice president terminated two other Company administrators and hired their personal friends who lacked experience.

***The Company Has Been Subject to Numerous Investigations As a Result of The Individual Defendants Misconduct.***

142. Prior to and throughout the Relevant Period, the Individual Defendants caused the Company to be subject to numerous federal investigations.

143. For example, on April 8, 2024, PACS Services and Paradise Valley Center received a CID from the DOJ questing information and documents relating to an investigation of Paradise Valley and Providence to determine whether Paradise Valley and Providence violated the False Claims Act by submitting false claims to Medicare (the "April 2024 DOJ Investigation). The annual report filed on Form 10-K for the 2025 fiscal year which was filed with the SEC on February 27, 2026 (the "2025 Form 10-K"), stated the following about the April 2024 DOJ Investigation:

> On April 8, 2024, Providence Administrative Consulting Services ("Providence") and Paradise Valley Healthcare Center ("Paradise Valley") received a Civil Investigative Demand ("CID") from the U.S. Department of Justice ("DOJ") requesting information and documents relating to an investigation of Paradise Valley and Providence to determine whether Paradise Valley and Providence violated the False Claims Act by submitting false claims to Medicare. The investigation relates to whether Providence and Paradise Valley improperly induced patient referrals through remuneration in violation of the Anti-Kickback Statute. The CID includes requests for information relating to referral source relationships, including relationships with medical directors and other individuals. Since the receipt of the CID, the DOJ has made additional requests for information from Providence, including marketing materials and certain expense data across all Providence facilities. We are cooperating with the investigation, which is ongoing.

144. On September 11, 2024, the Company received an additional CID from the DOJ regarding the Company's California facilities violating the False Claims Act by submitting false claims to Medicare (the "September 11, 2024 DOJ Investigation). The 2025 Form 10-K stated the following regarding the September 11, 2024 DOJ Investigation:

> On September 11, 2024, we received a CID from the DOJ requesting information and documents relating to an investigation of our California-based skilled nursing facilities to determine whether PACS violated the False Claims Act by submitting false claims to Medicare for reimbursement under the patient-driven payment model for skilled nursing and rehabilitation services. The CID includes requests for

information relating to PACS' practices and incentives pertaining to the completion and submission of Minimum Data Set Assessments and the resulting PDPM rates. We are cooperating with the investigation, which is ongoing.

145.    On September 30, 2024, Providence Group, Inc., a Company subsidiary, received a CID from the DOJ requesting information to determine whether Providence Group, Inc. violated the false claims act (the "September 30, 2024 DOJ Investigation"). The 2025 Form 10-K stated the following about the September 30, 2024 DOJ Investigation:

> On September 30, 2024, Providence Group, Inc. ("Providence Group") received a CID from the DOJ requesting information and documents relating to an investigation of its skilled nursing facilities, specifically including Bishop Care Center ("Bishop") to determine whether Providence Group violated the False Claims Act by submitting false claims to Medicare for reimbursement under the COVID-19 related Hospital Stay Waiver (otherwise known as the 1135 waiver).
>
> The CID includes requests for information relating to 1135 COVID Waiver practices at Bishop. We are cooperating with the investigation, which is ongoing.

146.    On February 26, 2025, the Company received a subpoena from the DOJ relating to possible fraudulent or false statements made to a branch of the United States government (the "DOJ Subpoena Action"). The 2025 Form 10-K stated the following regarding the DOJ Subpoena Action:

> On February 26, 2025, we received a subpoena from the DOJ per the HIPAA relating to an investigation into possible violations of various sections of 18 U.S.C. that prohibit the making of fraudulent or false statements to any branch of the government of the United States. The subpoena includes requests for information relating to PACS' 1135 COVID Waiver practices, billing of Medicare Part B for respiratory and sensory integration therapy services, change of insurance enrollment, cost waivers for co-pays, deductibles, and co-insurance, and claim reimbursement from Medicare for bad debt. We are cooperating with the investigation, which is ongoing.

147.    The Company is also under investigation by the SEC's Division of Enforcement relating to the Company's account and financial reporting and disclosures, and PACS' internal controls over financial reporting and disclosure controls. The 2025 Form 10-K states the following

regarding the investigation:

> The SEC's Division of Enforcement is conducting an investigation into matters that relate to our accounting and financial reporting and disclosure, and our internal controls over financial reporting and disclosure controls.

> We are cooperating with each of the regulatory investigations identified above and the SEC investigation to produce the requested information and documentation. At this time, we cannot predict the outcome of any of these investigations and there can be no assurance that one or more of these investigations will not result in suits or actions alleging, or findings of, violations of federal or state laws that could lead to the imposition of damages, fines, penalties, restitution, other monetary liabilities, sanctions, settlements or changes to our business practices or operations that could have a material adverse effect on our business, financial condition or results of operations. The legal costs associated with responding to the regulatory investigations and SEC investigations can be substantial, regardless of the outcome.

> We are unable at this time to estimate a loss or range of loss that may arise in the event that a claim is asserted against us in connection with any of these investigations for reasons including that these matters are in early stages, no factual issues have been resolved in these matters, and there is uncertainty as to the outcome of these matters, which can result in large settlement amounts or damage awards.

**False and Misleading Statements**

*April 11, 2024 IPO*

148.    On April 11, 2024, the Company's stock began to trade publicly on the NYSE. In connection with the IPO, the Company issued the IPO Materials, which were signed by Defendants Murray, Hancock, and Apt.  The IPO Materials provided investors with boilerplate risk disclosures about changes in reimbursements. Specifically, the IPO Materials stated, in relevant part:

> We rely on payments from third-party payors, including Medicare, Medicaid and other governmental healthcare programs and private insurance organizations. ***If coverage or reimbursement for services are changed, reduced or eliminated, including through cost-containment efforts, spending requirements are changed, data reporting, measurement and evaluation standards are enhanced and changed, our operations, revenue and profitability could be materially and adversely affected.***

149.    The statements contained in ¶148 above were materially false and misleading

because: (1) the end of the COVID Waiver already materially impacted the Company's revenues and profitability; (2) PACS' revenues were artificially inflated and required a restatement; (3) it was likely PACS would have to return recognized revenue to Medicare for the COVID Waiver Misconduct; (4) PACS' compliance with laws and regulations were overstated; and (5) as a result of the foregoing, PACS' risk disclosures mischaracterized adverse facts that the Company was actually facing as mere possibilities. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

150.    The IPO Materials also represented that, "from *time to time*," there are "*instances of noncompliance*" with billing processes, stating the following, in relevant part:

> We review and audit the care delivery, recordkeeping and billing processes of our operating subsidiaries. ***These reviews from time to time detect instances of noncompliance that we attempt to correct, which in some instances requires reduced or repayment of billed amounts or other costs.***

151.    The statements contained in ¶150 above were materially false and misleading because: (1) the Individual Defendants allowed the Company to engage in the Respiratory Therapy Misconduct and Sensory Therapy Misconduct; (2) as a result of the misconduct, PACS' revenues were artificially inflated and required a restatement; (3) it was likely PACS would have to return recognized revenue to Medicare for the Respiratory Therapy Misconduct and Sensory Therapy Misconduct; (4) issues with PACS' compliance with proper billing practices had already materialized; and (5) it failed to disclose a growing and material refund liability. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

152. The IPO Materials also represented that, *if* the Company was not in compliance with applicable laws and regulations, the Company "*could* be required to make significant expenditures." Specifically, the IPO Materials stated:

> We operate in a highly regulated industry with stringent regulatory compliance obligations, and are subject to extensive and complex laws and government regulations. *If we are not operating in compliance with these laws and regulations or if these laws and regulations change, we could be required to make significant expenditures or change our operations in order to bring our facilities and operations into compliance.*

153. The statements contained in ¶152 above were materially false and misleading because: (1) the Individual Defendants concealed the true impact of the end of the COVID Waiver; (2) billing uncertainties regarding Medicare revenue was already known to the Individual Defendants; (3) PACS was suffering from a material weakness in its compliance procedures; (4) PACS Services had already received a CID from DOJ regarding to violations of the False Claims Act; and (5) as a result, the Company's compliance was laws and regulations were overstated. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

154. The IPO Materials also touted the Company's purported growth as a result of its model of transforming underperforming SNFs, stating:

> Our *significant historical growth has been primarily driven by our expertise in acquiring underperforming long-term custodial care skilled nursing facilities and transforming them into higher acuity, high value-add short-term transitional care skilled nursing facilities.*

155. The statements contained in ¶154 above were materially false and misleading because PACS' success was not a result of the Company's ability to transform underperforming SNFs and instead was due to the improper billing of Medicare. As a result of the foregoing, the

Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

156.    The IPO Materials also highlighted PACS' purportedly "decentralized, local operating" business model, stating:

> We believe our success is driven in significant part by ***our decentralized, local operating model, through which we empower local leaders at each facility to operate their facility autonomously*** and deliver excellence in clinical quality and a superior experience for our patients.

157.    The statements contained in ¶156 above were materially false and misleading because: (1) PACS was not operating under a decentralized model; (2) the Individual Defendants issued top-down directives to improperly bill Medicare; and (3) the Company would not have been as successful if not for the Billing Misconduct. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

158.    The IPO Materials additionally touted the Company's approach to billing integrity, stating:

> ***Our rigorous approach to billing integrity, our independent internal compliance function, and our regular facility billing audits are intended to provide a foundation of trust*** and collaboration that makes us a natural choice for payors.

159.    The statements contained in ¶158 above were materially false and misleading because: (1) the Individual Defendants caused the Company to engage in the Billing Misconduct; (2) PACS employees had insider information in California that allowed the Company to obtain advanced notice of state audits; and (3) as a result of the Billing Misconduct, the Company's financials required a restatement. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and

misleading and/or lacked a reasonable basis at all relevant times.

### *May 13, 2024 Financial Reports*

160.    On May 13, 2024, the Company issued a press release announcing its financial results for the first fiscal quarter of 2024 (the "May 2024 Press Release"). In relevant part, the May 2024 Press Release stated:

> • *GAAP earnings per share for the quarter was $0.38, an increase of 31.0% over the prior year quarter.*
>
> • *GAAP net income was $49.1 million, an increase of 30.7% over the prior year quarter.*
>
> • *Consolidated GAAP revenue for the quarter was $934.7 million, an increase of 31.9% over the prior year quarter.*
>
> • EBITDA and Adjusted EBITDA for the quarter was $96.3 million and $88.5 million, representing increases of 47.0% and 34.0%, respectively, over the prior year quarter. Adjusted EBITDAR for the quarter was $152.5 million.

161.    The statements contained in ¶160 above were materially false and misleading because: (1) the Billing Misconduct artificially inflated the Company's financial results; (2) as a result, GAAP earnings per share, GAAP net income, consolidated GAAP revenue, and EBITDA and Adjusted EBITDA were all overstated; (3) $14.9 million of the Company's recognized revenue was actually uncertain; and (4) it failed to disclose the material and growing refund liability. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

162.    On the same day, the Company filed its Form 10-Q for the first fiscal quarter of 2024 with the SEC (the "1Q 2024 Form 10-Q"), which was signed by Defendants Murray and Apt. The 1Q 2024 Form 10-Q also contained certifications pursuant to Rules 13a-14(a) and 15(d)-14(a)

under the Exchange Act and the Sarbanes-Oxley Act of 2002 ("SOX") signed by Defendants Murray and Apt attesting to the accuracy of the 1Q Form 2024 10-Q and representing that the 1Q Form 2024 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

163.    The 1Q Form 2024 10-Q provided investors with the Company's balance sheet as of March 31, 2024, stating:

**Part I**

Item 1. Financial Statements

**PACS GROUP, INC. AND SUBSIDIARIES**
**CONDENSED COMBINED/CONSOLIDATED BALANCE SHEETS**
*(dollars in thousands, except for share values)*

| | | (unaudited) March 31, 2024 | | December 31, 2023 |
|---|---|---|---|---|
| **ASSETS** | | | | |
| Current Assets: | | | | |
| Cash and cash equivalents | $ | 81,213 | $ | 73,416 |
| Accounts receivable, net | | 622,737 | | 547,807 |
| Other receivables | | 66,014 | | 52,259 |
| Prepaid expenses and other current assets | | 61,761 | | 48,665 |
| Total Current Assets | | 831,725 | | 722,147 |
| Property and equipment, net | | 660,157 | | 577,528 |
| Operating lease right-of-use assets | | 2,175,169 | | 2,007,812 |
| Insurance subsidiary deposits and investments | | 25,201 | | — |
| Escrow funds | | 21,456 | | 15,649 |
| Goodwill and other indefinite-lived assets | | 65,291 | | 65,291 |
| Other assets | | 87,329 | | 124,312 |
| Total Assets | $ | 3,866,328 | $ | 3,512,739 |
| **LIABILITIES AND EQUITY** | | | | |
| Current Liabilities: | | | | |
| Accounts payable | $ | 157,000 | $ | 140,947 |
| Accrued payroll and benefits | | 143,811 | | 92,234 |
| Current operating lease liabilities | | 113,617 | | 109,438 |
| Current maturities of long term debt | | 16,837 | | 16,822 |
| Current portion of accrued self-insurance liabilities | | 29,210 | | 27,536 |
| Other accrued expenses | | 71,073 | | 69,949 |
| Total Current Liabilities | | 531,548 | | 456,926 |
| Long-term operating lease liabilities | | 2,123,865 | | 1,961,997 |
| Accrued benefits, less current portion | | 6,738 | | 6,738 |
| Lines of credit | | 537,000 | | 520,000 |
| Long-term debt, less current maturities, net of deferred financing fees | | 230,855 | | 195,708 |
| Accrued self-insurance liabilities, less current portion | | 154,892 | | 146,167 |
| Other liabilities | | 147,837 | | 123,477 |
| Total Liabilities | $ | 3,732,735 | $ | 3,411,013 |
| Commitments and contingencies (Note 11) | | | | |
| Equity: | | | | |
| PACS Group, Inc. stockholders' equity: | | | | |
| Common stock - 64,361,693,000 shares authorized, $0.001 par value, 128,723,386 shares issued and outstanding as of March 31, 2024 and December 31, 2023 | | 129 | | 129 |
| Accumulated other comprehensive income | | 201 | | — |
| Retained earnings | | 127,661 | | 95,997 |
| Total stockholders' equity | | 127,991 | | 96,126 |
| Noncontrolling interest in subsidiary | | 5,602 | | 5,600 |
| Total Equity | $ | 133,593 | $ | 101,726 |
| Total Liabilities and Equity | $ | 3,866,328 | $ | 3,512,739 |

164.    The statements contained in ¶163 above were materially false and misleading because: (1) the Company's success was overstated as a result of the Billing Misconduct; (2) line

items such as "Accounts receivable, net," "Total current assets," "Total assets," "Total current liabilities," "Total liabilities," and "Total equity" were inaccurate and required a restatement; (3) billing uncertainties requiring the restatement existed at the time when the 1Q 2024 Form 10-Q was prepared; (4) $14.9 million in revenue during this time was improperly recognized; and (5) it failed to disclose the growing refund liability. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

165.    The 1Q Form 2024 10-Q also provided investors with the Company's income statement as of March 31, 2024, stating:

PACS GROUP, INC. AND SUBSIDIARIES
UNAUDITED CONDENSED COMBINED/CONSOLIDATED STATEMENTS OF INCOME AND COMPREHENSIVE INCOME
(dollars in thousands, except for share and per share values)

| | | Three Months Ended March 31, | |
| --- | --- | --- | --- |
| | | 2024 | 2023 |
| **Revenue** | | | |
| Patient and resident service revenue | $ | 934,298 | $ 707,826 |
| Additional funding | | — | 375 |
| Other revenues | | 423 | 241 |
| **Total Revenue** | $ | 934,721 | $ 708,442 |
| **Operating Expenses** | | | |
| Cost of services | | 735,992 | 538,772 |
| Rent - cost of services | | 63,961 | 45,104 |
| General and administrative expense | | 46,906 | 59,442 |
| Depreciation and amortization | | 7,902 | 5,829 |
| **Total Operating Expenses** | $ | 854,761 | $ 649,147 |
| **Operating Income** | $ | 79,960 | $ 59,295 |
| **Other (Expense) Income** | | | |
| Interest expense | | (15,391) | (10,636) |
| Gain on lease termination | | 8,046 | — |
| Other income, net | | 440 | 440 |
| **Total Other Expense, net** | $ | (6,905) | $ (10,196) |
| Income before provision for income taxes | | 73,055 | 49,099 |
| Provision for income taxes | | (23,915) | (11,501) |
| **Net Income** | $ | 49,140 | $ 37,598 |
| Less: | | | |
| Net income attributable to noncontrolling interest | | 2 | 1 |
| **Net income attributable to PACS Group, Inc.** | $ | 49,138 | $ 37,597 |
| **Net income per common share attributable to PACS Group, Inc.** | | | |
| Basic and diluted | $ | 0.38 | $ 0.29 |
| **Weighted-average shares outstanding** | | | |
| Basic and diluted | | 128,723,386 | 128,723,386 |
| **Other comprehensive income, net of tax:** | | | |
| Unrealized gain on available-for-sale debt securities, net of tax | $ | 201 | $ — |
| Total other comprehensive income | | 201 | — |
| **Comprehensive income** | $ | 49,341 | $ 37,598 |
| Less: | | | |
| Comprehensive income attributable to noncontrolling interest | | 2 | 1 |
| **Comprehensive income attributable to PACS Group, Inc.** | $ | 49,339 | $ 37,597 |

166.    The statements contained in ¶165 above were materially false and misleading because: (1) the Company's success was overstated as a result of the Billing Misconduct; (2) line

items such as "Patient and resident service revenue," "Total revenue," "Operating income," "Net (loss) income," and "Net (loss) income per share attributable to PACS Group, Inc." were inaccurate and required a restatement; and (3) billing uncertainties requiring the restatement existed at the time when the 1Q 2024 Form 10-Q was prepared. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

167. The 1Q 2024 Form 10-Q also discussed how potential changes in Medicare reimbursements **may** affect the Company, stating the following, in relevant part:

> We rely on payments from third-party payors, including Medicare, Medicaid and other governmental healthcare programs and private insurance organizations. ***If coverage or reimbursement for services are changed, reduced or eliminated, including through cost-containment efforts, spending requirements are changed, data reporting, measurement and evaluation standards are enhanced and changed, our operations, revenue and profitability could be materially and adversely affected.***

168. The statements contained in ¶167 above were materially false and misleading because: (1) the Individual Defendants allowed the Company to engage in the COVID Waiver Misconduct; (2) the Individual Defendants concealed the true extent of the negative impact from the end of the COVID Waiver; (3) billing uncertainties had already materialized; (4) it was likely PACS would have to return recognized revenue to Medicare for the COVID Waiver Misconduct; (5) it failed to disclose the growing refund liability; (6) PACS' compliance with laws and regulations were overstated; and (7) as a result of the foregoing, PACS' risk disclosures mischaracterized adverse facts that the Company was actually facing as mere possibilities. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

169.    The 1Q 2024 Form 10-Q stated how the Company occasionally experienced compliance issues with billing practices, stating:

> We review and audit the care delivery, recordkeeping and billing processes of our operating subsidiaries. ***These reviews from time to time detect instances of noncompliance that we attempt to correct, which in some instances requires reduced or repayment of billed amounts or other costs.***

170.    The statements contained in ¶169 above were materially false and misleading because: (1) the Individual Defendants allowed the Company to engage in the Respiratory Therapy Misconduct and Sensory Therapy Misconduct; (2) as a result of the misconduct, PACS' revenues were artificially inflated and required a restatement; (3) it was likely PACS would have to return recognized revenue to Medicare for the Respiratory Therapy Misconduct and Sensory Therapy Misconduct; (4) issues with PACS' compliance with proper billing practices had already materialized; and (5) it failed to disclose a growing and material refund liability. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

171.    The 1Q 2024 Form 10-Q further represented that the Company "could" make significant expenditures if the Company was in violation of laws and regulations, stating:

> We are subject to extensive and complex laws and government regulations. ***If we are not operating in compliance with these laws and regulations or if these laws and regulations change, we could be required to make significant expenditures or change our operations in order to bring our facilities and operations into compliance.***

172.    The statements contained in ¶171 above were materially false and misleading because: (1) the Individual Defendants concealed the true impact of the end of the COVID Waiver; (2) billing uncertainties regarding Medicare revenue was already known to the Individual

Defendants; (3) PACS was suffering from a material weakness in its compliance procedures; (4) PACS Services had already received a CID from DOJ regarding to violations of the False Claims Act; and (5) as a result, the Company's compliance was laws and regulations were overstated. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

173. The same day, the Company hosted an earnings call to discuss its financial results for the first fiscal quarter of 2024 (the "1Q 2024 Earnings Call"). During the 1Q 2024 Earnings Call, Defendant Murray stated that ***"[O]ur average daily Medicare rates increased by 11% for the 3 months ended March 31, 2024 compared to the first quarter of 2023***."

174. The statements contained in ¶173 above were materially false and misleading because: (1) the Individual Defendants caused the Company to engage in the Billing Misconduct; (2) billing uncertainties had already materialized; and (3) as a result, the Company's financial statements required a restatement. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

175. Defendant Apt also touted PACS' Medicare revenue for the first quarter, stating:

> [O]ur average Medicare revenue per patient day ***remained strong through Q1 at both our ramping and Mature facilities at $969 and $938 respectively, compared to '23 where our average Medicare revenue per patient day at Ramping ad Mature was [$]836 and [$]846, respectively***.

176. The statements contained in ¶175 above were materially false and misleading because: (1) the Individual Defendants caused the Company to engage in the Billing Misconduct; and (2) billing uncertainties had already materialized. As a result of the foregoing, the Individual

Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### *1Q 2024 Investor Presentation*

177.    The Company also released an investor presentation in connection with the 1Q 2024 Earnings Call further highlighting the Company's business model (the "1Q 2024 Investor Presentation"). For example, the 1Q 2024 Investor Presentation stated:

> Forward-looking statements are not guarantees of future results and are *subject to risks, uncertainties and assumptions, which may change over time and many of which are beyond the Company's contro*l, and that could cause the Company's actual results to materially and adversely differ from those expressed in any forward-looking statement, including...risks associated with our *review and audit of the care delivery, record keeping and billing processes of our operating subsidiaries*...

178.    The statements contained in ¶177 above were materially false and misleading because: (1) the Individual Defendants caused the Company to engage in the Billing Misconduct; (2) billing uncertainties had already materialized; (3) the billing uncertainties was overseen and implemented company-wide by the Individual Defendants; and (4) as a result, the Company's financial statements required a restatement. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

179.    The 1Q 2024 Investor Presentation also touted the Company's local operational autonomy, stating: "*Model prioritizes local operational autonomy*, leveraging robust technology and support services for responsive *decision-making based on community needs, enhancing patient care and facility operations*."

180.    The statements contained in ¶179 above were materially false and misleading because: (1) the Individual Defendants caused the Company to engage in the Billing Misconduct

and Patient Neglect Misconduct; and (2) PACS' operating model was not decentralized. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

### August 12, 2024 Financial Reports

181.     On August 12, 2024, the Company issued a press release announcing its financial results for the second fiscal quarter of 2024 (the "August 2024 Press Release"). The August 2024 Press Release provided investors with the Company's financial results for the second quarter of 2024, stating:

> • *GAAP net income (loss) was $38.2 million for the six months ended June 30, 2024* and $(10.9) million for the second quarter of 2024, which was driven down by an increase in stock-based compensation expense of $90.9 million associated with restricted stock units, granted at the time of the Company's April 2024 initial public offering.
>
> • *Consolidated GAAP revenue for the first six months of 2024 was $1.9 billion, an increase of 31% over the first six months of the prior year, driven largely by increased facility count and reimbursement rates, and for the second quarter of 2024 was $981.8 million, an increase of 29% over the second quarter of 2023 and an increase of 5% over the first quarter of 2024.*
>
> • *Adjusted EBITDA was $188.2 million and $99.7 million for the first six months of 2024 and the second quarter of 2024, respectively.* Adjusted EBITDAR was $318.0 million and $165.6 million over the same periods, respectively.

182.     The statements contained in ¶181 above were materially false and misleading because: (1) the Billing Misconduct artificially inflated the Company's financial results; (2) as a result, GAAP net income (loss), consolidated GAAP revenue, and Adjusted EBITDA were all overstated; (3) it failed to disclose a refund liability of $30.6 million; and (4) billing uncertainties were known to the Individual Defendants. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and

misleading and/or lacked a reasonable basis at all relevant times.

183.    On the same day, the Company filed the 2Q 2024 Form 10-Q, which was signed by Defendants Murray and Apt. The 2Q 2024 Form 10-Q also contained certifications pursuant to Rules 13a-14(a) and 15(d)-14(a) under the Exchange Act and SOX signed by Defendants Murray and Apt attesting to the accuracy of the 2Q 2024 Form 10-Q and representing that the 2Q 2024 Form 10-Q "does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report[.]"

184.    The 2Q 2024 Form 10-Q provided investors with the Company's balance sheet as of June 20, 2024:

Item 1. Financial Statements

**PACS GROUP, INC. AND SUBSIDIARIES**
**CONDENSED COMBINED/CONSOLIDATED BALANCE SHEETS**
*(dollars in thousands, except for share and per share values)*

| | (unaudited) June 30, 2024 | December 31, 2023 |
|---|---|---|
| **ASSETS** | | |
| Current Assets: | | |
| Cash and cash equivalents | $ 73,374 | $ 73,416 |
| Accounts receivable, net | 610,577 | 547,807 |
| Other receivables | 50,396 | 52,259 |
| Prepaid expenses and other current assets | 66,301 | 48,665 |
| Total Current Assets | 800,648 | 722,147 |
| Property and equipment, net | 763,904 | 577,528 |
| Operating lease right-of-use assets | 2,112,914 | 2,007,812 |
| Insurance subsidiary deposits and investments | 35,476 | |
| Escrow funds | 19,531 | 15,649 |
| Goodwill and other indefinite-lived assets | 65,291 | 65,291 |
| Other assets | 98,584 | 124,312 |
| Total Assets | $ 3,896,348 | $ 3,512,739 |
| | | |
| **LIABILITIES AND EQUITY** | | |
| Current Liabilities: | | |
| Accounts payable | $ 125,746 | $ 140,947 |
| Accrued payroll and benefits | 107,077 | 92,234 |
| Current operating lease liabilities | 113,278 | 109,438 |
| Current maturities of long term debt | 15,745 | 16,822 |
| Current portion of accrued self-insurance liabilities | 31,252 | 27,536 |
| Other accrued expenses | 75,003 | 69,949 |
| Total Current Liabilities | 468,101 | 456,926 |
| Long-term operating lease liabilities | 2,068,585 | 1,961,997 |
| Accrued benefits, less current portion | 6,738 | 6,738 |
| Lines of credit | 248,000 | 520,000 |
| Long-term debt, less current maturities, net of deferred financing fees | 227,107 | 195,708 |
| Accrued self-insurance liabilities, less current portion | 172,111 | 146,167 |
| Other liabilities | 127,472 | 123,477 |
| Total Liabilities | $ 3,318,114 | $ 3,411,013 |
| Commitments and contingencies (Note 11) | | |
| Equity: | | |
| PACS Group, Inc. stockholders' equity: | | |
| Common stock: $0.001 par value; 1,250,000,000 shares authorized, 152,399,733 shares issued and outstanding as of June 30, 2024, and 64,361,693,000 shares authorized, 128,723,386 shares issued and outstanding as of December 31, 2023 | 152 | 129 |
| Additional paid-in capital | 471,472 | |
| Retained earnings | 100,504 | 95,997 |
| Total stockholders' equity | 572,128 | 96,126 |
| Non-controlling interest in subsidiary | 6,106 | 5,600 |
| Total Equity | $ 578,234 | $ 101,726 |
| Total Liabilities and Equity | $ 3,896,348 | $ 3,512,739 |

185.     The statements contained in ¶184 above were materially false and misleading because: (1) it failed that PACS' success was due to the Billing Misconduct; (2) line items such as "Accounts receivable, net," "Total current assets," "other assets," "Total assets," "Accrued payroll and benefits," "Other liabilities," "Total current liabilities," "Total liabilities," and "Total equity," required a restatement; (3) it failed to disclose a $30.6 million refund liability; and (4) billing uncertainties were known to the Individual Defendants. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

186.     The 2Q 2024 Form 10-Q also provided investors with the Company's income

statement as of June 30, 2024:

**PACS GROUP, INC. AND SUBSIDIARIES**
**UNAUDITED CONDENSED COMBINED/CONSOLIDATED STATEMENTS OF (LOSS) INCOME AND COMPREHENSIVE (LOSS) INCOME**
*(dollars in thousands, except for share and per share values)*

| | | Three Months Ended June 30, | | Six Months Ended June 30, | |
|---|---|---|---|---|---|
| | | 2024 | 2023 | 2024 | 2023 |
| **Revenue** | | | | | |
| Patient and resident service revenue | $ | 981,398 | $ 760,424 | $ 1,915,696 | $ 1,468,250 |
| Additional funding | | — | — | — | 375 |
| Other revenues | | 448 | 240 | 871 | 481 |
| **Total Revenue** | $ | 981,846 | $ 760,664 | $ 1,916,567 | $ 1,469,106 |
| | | | | | |
| **Operating Expenses** | | | | | |
| Cost of services | | 762,147 | 590,815 | 1,498,139 | 1,129,587 |
| Rent - cost of services | | 65,833 | 51,456 | 129,794 | 96,560 |
| General and administrative expense | | 144,380 | 62,695 | 191,286 | 122,137 |
| Depreciation and amortization | | 8,776 | 6,159 | 16,678 | 11,988 |
| **Total Operating Expenses** | $ | 981,136 | $ 711,125 | $ 1,835,897 | $ 1,360,272 |
| | | | | | |
| **Operating Income** | $ | 710 | $ 49,539 | $ 80,670 | $ 108,834 |
| | | | | | |
| **Other (Expense) Income** | | | | | |
| Interest expense | | (9,187) | (15,306) | (24,578) | (25,942) |
| Gain on lease termination | | — | — | 8,046 | — |
| Other expense, net | | (3,905) | (2,643) | (3,465) | (2,203) |
| **Total Other Expense, net** | $ | (13,092) | $ (17,949) | $ (19,997) | $ (28,145) |
| | | | | | |
| (Loss) income before provision for income taxes | | (12,382) | 31,590 | 60,673 | 80,689 |
| Benefit (provision) for income taxes | | 1,474 | (10,370) | (22,441) | (21,871) |
| | | | | | |
| **Net (Loss) Income** | $ | (10,908) | $ 21,220 | $ 38,232 | $ 58,818 |
| Less: | | | | | |
| Net income attributable to noncontrolling interest | | 2 | 2 | 4 | 3 |
| Net (loss) income attributable to PACS Group, Inc. | $ | (10,910) | $ 21,218 | $ 38,228 | $ 58,815 |
| | | | | | |
| **Net (loss) income per share attributable to PACS Group, Inc.** | | | | | |
| Basic | $ | (0.07) | $ 0.16 | $ 0.27 | $ 0.46 |
| Diluted | $ | (0.07) | $ 0.16 | $ 0.27 | $ 0.46 |
| **Weighted-average common shares outstanding** | | | | | |
| Basic | | 149,463,655 | 128,723,386 | 139,093,520 | 128,723,386 |
| Diluted | | 149,463,655 | 128,723,386 | 139,684,618 | 128,723,386 |
| | | | | | |
| **Other comprehensive loss, net of tax:** | | | | | |
| Unrealized loss on available-for-sale debt securities, net of tax | $ | (201) | $ — | $ — | $ — |
| Total other comprehensive loss | | (201) | — | — | — |
| **Comprehensive (loss) income** | $ | (11,109) | $ 21,220 | $ 38,232 | $ 58,818 |
| Less: | | | | | |
| Comprehensive income attributable to noncontrolling interest | | 2 | 2 | 4 | 3 |
| **Comprehensive (loss) income attributable to PACS Group, Inc.** | $ | (11,111) | $ 21,218 | $ 38,228 | $ 58,815 |

187.    The statements contained in ¶185 above were materially false and misleading because: (1) it failed that PACS' success was due to the Billing Misconduct; (2) line items such as "Patient and resident service revenue," "Total revenue," "general and administrative expense," "Operating income," "Net (loss) income," and "Net (loss) income per share attributable to PACS Group, Inc.," required a restatement; (3) $46.1 million in quarterly revenue and at least $61 million in six-month recognized revenue was actually uncertain; and (4) billing uncertainties were known to the Individual Defendants. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading

and/or lacked a reasonable basis at all relevant times.

188.   The 2Q 2024 Form 10-Q continued to represent that "if" Medicare changed their reimbursements, the Company's "operations, revenue and profitability could be materially and adversely impacted," stating:

> We rely on payments from third-party payors, including Medicare, Medicaid and other governmental healthcare programs and private insurance organizations. ***If coverage or reimbursement for services are changed, reduced or eliminated, including through cost-containment efforts, spending requirements are changed, data reporting, measurement and evaluation standards are enhanced and changed, our operations, revenue and profitability could be materially and adversely affected.***

189.   The statements contained in ¶188 above were materially false and misleading because: (1) the Individual Defendants allowed the Company to engage in the COVID Waiver Misconduct; (2) the Individual Defendants concealed the true extent of the negative impact from the end of the COVID Waiver; (3) billing uncertainties had already materialized; (4) it was likely PACS would have to return recognized revenue to Medicare for the COVID Waiver Misconduct; (5) it failed to disclose the growing refund liability; (6) PACS' compliance with laws and regulations were overstated; and (7) as a result of the foregoing, PACS' risk disclosures mischaracterized adverse facts that the Company was actually facing as mere possibilities. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

190.   The 2Q 2024 Form 10-Q also represented that the Company was occasionally in noncompliance with billing procedures, stating:

> We review and audit the care delivery, recordkeeping and billing processes of our operating subsidiaries. ***These reviews from time to time detect instances of noncompliance that we attempt to correct, which in some instances requires***

***reduced or repayment of billed amounts or other costs.***

191.    The statements contained in ¶190 above were materially false and misleading because: (1) the Individual Defendants allowed the Company to engage in the Respiratory Therapy Misconduct and Sensory Therapy Misconduct; (2) as a result of the misconduct, PACS' revenues were artificially inflated and required a restatement; (3) it was likely PACS would have to return recognized revenue to Medicare for the Respiratory Therapy Misconduct and Sensory Therapy Misconduct; (4) issues with PACS' compliance with proper billing practices had already materialized; and (5) it failed to disclose a growing and material refund liability. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

192.    The 2Q 2024 Form 10-Q further stated that PACS "could" be required to make significant expenditures if PACS fell out of legal and regulatory compliance, stating:

> We are subject to extensive and complex laws and government regulations. ***If we are not operating in compliance with these laws and regulations or if these laws and regulations change, we could be required to make significant expenditures or change our operations in order to bring our facilities and operations into compliance.***

193.    The statements contained in ¶192 above were materially false and misleading because: (1) the Individual Defendants concealed the true impact of the end of the COVID Waiver; (2) billing uncertainties regarding Medicare revenue was already known to the Individual Defendants; (3) PACS was suffering from a material weakness in its compliance procedures; (4) PACS Services had already received a CID from DOJ regarding to violations of the False Claims Act; and (5) as a result, the Company's compliance was laws and regulations were overstated. As a result of the foregoing, the Individual Defendants' statements about the Company's business,

operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

194. The same day, the Company held an earnings call to discuss its financial results for the second quarter of 2024 (the "2Q 2024 Earnings Call"). During the 2Q 2024 Earnings Call, Defendant Murray touted PACS' local operating model, stating: "In addition to training new leaders, *the PACS leadership model allows our local leaders to make operational decisions as close to our patients and employees as possible*, which is ultimately better for the residents and community in which they live."

195. The statements contained in ¶194 above were materially false and misleading because: (1) the Individual Defendants issued top-down directives to PACS facilities; (2) the Individual Defendants rewarded those who followed their directives and fired those who didn't; and (3) as a result, PACS was not operating a locally autonomous business model. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

196. The Company also released an investor presentation in connection with the 2Q 2024 Earnings Call further highlighting the Company's business model (the "2Q 2024 Investor Presentation"). For example, the 2Q 2024 Investor Presentation stated:

> Forward-looking statements are not guarantees of future results and *are subject to risks, uncertainties and assumptions, which may change over time and many of which are beyond the Company's control*, and that could cause the Company's actual results to materially and adversely differ from those expressed in any forward-looking statement, including...risks associated with our review and audit of the care delivery, recordkeeping *and billing processes of our operating subsidiaries* . . .

197. The statements contained in ¶196 above were materially false and misleading

because: (1) the Individual Defendants issued top-down directives to engage in the Billing Misconduct; (2) billing uncertainties had already materialized; and (3) as a result, the Company's financial statements were inflated and required a restatement.  As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

198.    The 2Q 2024 Investor Presentation further touted the Company's operating model, stating: "Model prioritizes *local operational autonomy*, leveraging robust technology and support services for *responsive decision-making based on community needs, enhancing patient care and facility operations*."

199.    The statements contained in ¶198 above were materially false and misleading because: (1) the Individual Defendants caused the Company to engage in the Billing Misconduct and the Patient Neglect Misconduct; (2) the Individual Defendants issued top-down directives to PACS facilities; and (3) as a result, PACS was not operating a locally autonomous business model. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times

### September 5, 2024 SPO Materials

200.    On September 5, 2024, the Company filed the SPO Materials which were signed by Defendants Murray, Hancock, and Apt. The SPO Materials continued to represent that changes in Medicare reimbursements "may" impact the Company, stating:

> We rely on payments from third-party payors, including Medicare, Medicaid and other governmental healthcare programs and private insurance organizations. *If coverage or reimbursement for services are changed, reduced or eliminated, including through cost-containment efforts, spending requirements are changed, data reporting, measurement and evaluation standards are enhanced and*

*changed, our operations, revenue and profitability could be materially and adversely affected.*

201.    The statements contained in ¶200 above were materially false and misleading because: (1) the end of the COVID Waiver already materially impacted the Company's revenues and profitability; (2) PACS' revenues were artificially inflated and required a restatement; (3) it was likely PACS would have to return recognized revenue to Medicare for the COVID Waiver Misconduct; (4) PACS' compliance with laws and regulations were overstated; and (5) as a result of the foregoing, PACS' risk disclosures mischaracterized adverse facts that the Company was actually facing as mere possibilities. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

202.    The SPO Materials also represented that the Company was occasionally in noncompliance with recordkeeping and billing processes, stating:

> We review and audit the care delivery, recordkeeping and billing processes of our operating subsidiaries. *These reviews from time to time detect instances of noncompliance that we attempt to correct, which in some instances requires reduced or repayment of billed amounts or other costs.*

203.    The statements contained in ¶202 above were materially false and misleading because: (1) the Individual Defendants allowed the Company to engage in the Respiratory Therapy Misconduct and Sensory Therapy Misconduct; (2) as a result of the misconduct, PACS' revenues were artificially inflated and required a restatement; (3) it was likely PACS would have to return recognized revenue to Medicare for the Respiratory Therapy Misconduct and Sensory Therapy Misconduct; (4) issues with PACS' compliance with proper billing practices had already materialized; and (5) it failed to disclose a growing and material refund liability. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and

prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

204. The SPO Materials additionally stated that PACS "could" be required to make significant expenditures "if" the Company fell out of legal and regulatory compliance, stating:

We operate in a highly regulated industry with stringent regulatory compliance obligations, and are subject to extensive and complex laws and government regulations. *If we are not operating in compliance with these laws and regulations or if these laws and regulations change, we could be required to make significant expenditures or change our operations in order to bring our facilities and operations into compliance.*

205. The statements contained in ¶204 above were materially false and misleading because: (1) the Individual Defendants concealed the true impact of the end of the COVID Waiver; (2) billing uncertainties regarding Medicare revenue was already known to the Individual Defendants; (3) PACS was suffering from a material weakness in its compliance procedures; (4) PACS Services had already received a CID from DOJ regarding to violations of the False Claims Act; and (5) as a result, the Company's compliance was laws and regulations were overstated. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

206. The SPO Materials also touted the Company's business model and growth, stating:

Our *significant historical growth has been primarily driven by our expertise in acquiring underperforming long-term custodial care skilled nursing facilities and transforming them into higher acuity, high value-add short-term transitional care skilled nursing facilities.*

207. The statements contained in ¶206 above were materially false and misleading because PACS' success was not a result of the Company's ability to transform underperforming SNFs and instead was due to the improper billing of Medicare. As a result of the foregoing, the

Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

208.    Additionally, the SPO Materials highlighted PACS' local operating model, stating:

We believe our success is driven in significant part by ***our decentralized, local operating model, through which we empower local leaders at each facility to operate their facility autonomously*** and deliver excellence in clinical quality and a superior experience for our patients.

209.    The statements contained in ¶208 above were materially false and misleading because: (1) PACS was not operating under a decentralized model; (2) the Individual Defendants issued top-down directives to improperly bill Medicare; and (3) the Company would not have been as successful if not for the Billing Misconduct. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

210.    The SPO Materials also highlighted PACS' "rigorous approach to billing integrity:"

***Our rigorous approach to billing integrity, our independent internal compliance function, and our regular facility billing audits are intended to provide a foundation of trust*** and collaboration that makes us a natural choice for payors.

211.    The statements contained in ¶210 above were materially false and misleading because: (1) the Individual Defendants caused the Company to engage in the Billing Misconduct; (2) PACS employees had insider information in California that allowed the Company to obtain advanced notice of state audits; and (3) as a result of the Billing Misconduct, the Company's financials required a restatement. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at all relevant times.

**The Truth Emerges**

### *The Hindenburg Report*

212.    The truth began to emerge on November 4, 2024, when Hindenburg released its report revealing the Company's manipulation and misuse of the COVID Waiver program, fraudulent billing practices, and circumvention of State healthcare laws. The Hindenburg Report described the COVID Waiver scheme as a "***management-driven***, companywide scheme to defraud Medicare through the COVID emergency, evidenced by anomalies in PACS's Medicare revenue, and corroborated by more than a dozen former PACS employee."

213.    In regard to the COVID Waiver, the Hindenburg Report revealed that the Company continued to bill patients under the COVID Waiver 100 days after it expired. Specifically, the Hindenburg Report stated:

> The COVID waiver expired on May 11th, 2023, but any patients who had already accessed Medicare benefits under the waiver could continue doing so until their 100- day benefit period had ended, meaning SNFs could benefit financially from the waiver as late as August 2023, according to the AHCA.

214.    The Hindenburg Report detailed how Company management was able to flip entire facilities from Medicaid to Medicare based on a single positive COVID test, "absolutely inappropriately."  A former employee interviewed by Hindenburg stated that flipping patients was easy "with the [COVID] waiver in place because it was just internal documentation."

215.    The Hindenburg Report also commented on how the COVID Waiver Misconduct inflated the Company's revenues. For example, the Hindenburg Report analyzed 26 of the Company's facilities that were operating at full potential before the COVID Waiver took place. The Hindenburg Report stated that despite the facilities already operating at full potential, Medicare revenue increased by 190% during the pandemic, from $52.2 million in 2019 to $151.5 million in 2022. The Hindenburg Report also found that competitors Medicare revenue at its SNFs

only grew 23% during this time.

216.    The Hindenburg Report further detailed how the expiration of the COVID Waiver

impacted the Company:

[A]fter the COVID waiver expired, PACS' quarterly Medicare revenue declined suddenly and without explanation from a reported peak of ~$340 million in Q1 2023 to an estimated $271 million in Q4 2023.... When accounting for and removing the impact of newly acquired facilities, the fall-off in Medicare revenue was an estimated ~$90 million per quarter, equivalent to ~$360 million in annualized revenue.



(Source: PACS Financial Statements [Pgs. 15, 16, and F-17] and Hindenburg estimates) We believe this decline indicates that PACS was generating hundreds of millions of dollars a year in Medicare revenue from the COVID waiver scheme, allowing it to go public with the illusion of rapid, legitimate growth and profitability.... With former employees explaining that most of the COVID waiver revenue flowed right to the bottom line, we estimate that the scheme flipped PACS' financials from negative to strongly positive, likely contributing more than 100% of PACS' 2022 and 2023 operating income of $229 million and $207 million, respectively. (Footnotes omitted.)

217.    The Hindenburg Report also revealed how there was a "widespread, *top-down*

*directive to perform unnecessary respiratory therapies, among other therapies, on thousands of*

*patients, regardless of clinical need or outcomes*." The Hindenburg Report further stated that Company employees did not have time "to deliver the volume of respiratory therapy that PACS management was asking for, so they would simply document that they had." Former employees further stated that "You know, basically, PACS turned a blind eye and said, whatever you need to do to get these numbers and get this filled out, do it." The Hindenburg Report additionally stated that the Respiratory Therapy Misconduct was a way to "limp [PACS] through another year or two before CMS catches onto this and shuts it down."

218.    The Hindenburg Report quoted former employees describing the Sensory Therapy Misconduct as a "new trick to get back to COVID level profitability." A former employee was quoted saying that the Company was "putting everyone on respiratory therapy for Part B, and they're putting everyone on sensory integration, even if it's not really that applicable."

219.    New details emerged regarding the Individual Defendants scheme to allow unlicensed individuals to run facilities through hanging. The Hindenburg Report detailed that the Individual Defendants would allow the Company to "simply use someone else's license for a facility, despite that person not actively working at the facility" and "would pay third parties as much as $5,000 a month to 'rent' their licenses" to unlicensed individuals.

220.    The Hindenburg Report also revealed how the Individual Defendants caused the Company to evade nurse staffing ratio regulations, quoting a former employee as stating:

> …they would manipulate those numbers because the Nas you can pay less, so they would have more NAs on the floor than the CNAs. But they would have them in the system as a CNA...they'd been working for 2 years under a license that wasn't there, and they were billing according to staffing which was inaccurate.

221.    The Hindenburg Report further quoted a former employee, stating:

> I would say it was probably happening at most of their original 57 buildings...I'm not sure how long it was happening, but my assumption is that they were doing it

during all of COVID, because they could...I do know that probably, maybe 1/3 of their buildings, if not more, had these Nas listed as CNAs...There's no reason to put someone into the system as having an actual license unless they have an actual license, unless you're trying to cheat your staffing ratios.

222.    The Hindenburg Report also detailed how employees who questioned the Individual Practices were terminated. Specifically, a former employee interviewed by Hindenburg stated:

Pretty much anyone who spoke up ended up not having a job anymore… People would call me and say that they weren't comfortable being the actual admin because they weren't licensed… And basically, I would be told, 'oh, you don't need to worry about that'… And then I would typically get a call, maybe 30 days or less… telling me that we needed to terminate that person because their numbers were too low or whatever, and it did happen kind of often…

223.    On this news, the price per share of PACS stock fell $11.93, or approximately 27.78%, from a closing price of $42.94 per share on November 1, 2024 to close at $31.01 per share on November 4, 2024, on unusually heavy trading volume.

### *November 6, 2024 Form 8-K*

224.    The truth fully emerged before the market opened on November 6, 2024, when the Company announced it would postpone its earnings release for the fiscal third quarter of 2024. The Company disclosed it had "***received civil investigative demands from the federal government regarding the Company's reimbursement and referral practices that may or may not be related to this week's third-party report.***" The Company also quoted Defendant Murray as stating: "recent third-party allegations are misleading. However, in line with our commitment to holding ourselves to a high standard...the Company's Audit Committee, with assistance from external counsel, is conducting an investigation of the allegations."

225.    On this news, the price per share of PACS stock fell $11.45, or approximately 38.76%, from a closing price of $29.54 per share on November 5, 2024 to close at $18.09 per share

on November 6, 2024, after unusually heavy trading volume.

### *December 17, 2024 J.P. Morgan Stock Downgrade*

226.    The truth fully emerged on December 17, 2024, when J.P. Morgan, the Company's underwriter, downgraded the Company's stock. J.P. Morgan stated that substantial "overhang" by the federal investigation and the Company's lack of clarity caused the stock rating to be downgraded. Specifically, J.P. Morgan stated that there was material uncertainty in the Company's compliance, billing practices, and earnings.

227.    On this news, the price per share of PACS stock fell $1.23, or approximately 8.1%, from a closing price of $15.18 per share on December 16, 2024 to close at $13.95 per share on December 17, 2024, after unusually heavy trading volume.

## SUBSEQUENT DEVELOPMENTS

### *June 16, 2025 Form 8-K*

228.    On June 16, 2025, the Company filed a current report on Form 8-K announcing that its previously issued financial statements for the first and second quarters of 2024 could no longer be relied upon and needed to be restated (the "Restatement Form 8-K"). The Restatement Form 8-K further stated that due to "third-party allegations," PACS' management determined to "reconsider the Company's...assessments of the compliance of its respiratory and certain other therapy services" because of "additional facts learned" from the Company's investigation and "regulatory, compliance and Medicare Part B billing uncertainties." The Restatement Form 8-K provided investors with updated financial information for the first and second quarters of 2024, stating that the Company overstated its revenue by approximately $15–$17 million for the three-month period ended March 31, 2024, and approximately $46–$48 million for the period ended June 30, 2024.

*August 15, 2025 Defendant Sanford Resignation*

229.    On August 15, 2025, the Company announced that Defendant Sanford had resigned from all positions with the Company effective immediately.

*September 8, 2025 Defendant Apt Resignation Form 8-K*

230.    On September 8, 2025, the Company filed a current report on Form 8-K with the SEC announcing the resignation of Defendant Apt as the Company's CFO (the "Defendant Apt Resignation Form 8-K"). The Defendant Apt Resignation Form 8-K revealed that the Audit Committee made interim findings that Defendant Apt had violated the Company's Code of Ethics. Specifically, the Defendant Apt Resignation Form 8-K stated, in relevant part:

> On September 2, 2025, Derick Apt resigned from his role as Chief Financial Officer of PACS Group, Inc. (the "Company"). In mid-July 2025, while its previously disclosed investigation was ongoing, the Audit Committee of the Company's board of directors became aware of allegations that Mr. Apt had accepted a series of high-value items from individuals associated with a group of related entities with which the Company does business. The Audit Committee immediately began investigating those allegations. Based upon the results of that work, the Audit Committee made interim findings that Mr. Apt's receipt of these items of value violated company policies, including the Company's Code of Conduct. Thereafter, the Board asked for, and Mr. Apt offered, his resignation.

*November 19, 2025 Financial Restatements*

231.    On November 19, 2025, the Company filed its financial restatements for the first and second quarter of 2024. The restated annual report on Form 10-K for the 2024 fiscal year (the "2024 Restated Form 10-K") stated, in relevant part:

> On June 16, 2025, the Company announced that, in connection with additional facts learned, including as a result of the Audit Committee's independent investigation, and due to regulatory, compliance and Medicare Part B billing uncertainties, management determined that it is appropriate to reconsider the Company's judgmental assessments of the compliance of its respiratory and certain other therapy services. Management also determined that it is appropriate to reconsider the application of certain aspects of revenue recognition guidance under Financial Accounting Standards Board (FASB) Accounting Standards Codification (ASC)

Topic 606, Revenue from Contracts With Customers ("ASC606"), including with respect to estimating variable consideration and constraining estimated variable consideration related to revenue from billings for such services. *As a result, the Company determined that the revenue associated with the provision of respiratory services and certain other therapy services billed under Medicare Part B should not have been recognized as revenue in accordance with ASC 606 in the periods discussed below.*

Accordingly, the Company determined that it would restate previously issued financial statements as of March 31, 2024, and for the three months then ended, included in the Company's Quarterly Report on Form 10-Q filed with the SEC on May 13, 2024 (as amended on May 21, 2024) and as of June 30, 2024, and for the three and six months then ended, included in the Company's Quarterly Report on Form 10-Q filed with the SEC on August 12, 2024.

\* \* \*

Subsequent to the issuance of the Company's Quarterly Report on Form 10-Q filed on August 12, 2024, we received information that indicated certain ancillary services, including respiratory, sensory integration and wound care ultrasound mist therapy, may not be eligible for reimbursement under Medicare Part B. We determined that due to the underlying regulatory ambiguity those certain ancillary services revenue may be subject to significant reversal in the future. As such, we have concluded that such revenue should not be recognized until definitive conclusions regarding the eligibility of billing those certain ancillary services under Medicare Part B is permissible. In accordance with ASC 250 - Accounting Changes and Error Corrections, SEC Staff Accounting Bulletin ("SAB") No. 99 - Materiality, and SAB No. 108 - Considering the Effects of Prior Year Misstatements when Quantifying Misstatements in Current Year Financial Statements, *management concluded the unaudited Condensed Combined/Consolidated financial statements for the three months ended March 31, 2024, and the three and six months ended June 30, 2024 (the "Restatement Periods") required restatement.*

\* \* \*

*Material Weakness*

In connection with the preparation of our combined/consolidated financial statements for the year ended December 31, 2024, together with facts learned during the course of the Audit Committee's independent investigation, our *management identified control deficiencies that, individually or in the aggregate, constitute material weaknesses in our internal control over financial reporting*. The material weaknesses identified by management were that we did not design and maintain an effective internal control environment commensurate with the

financial reporting requirements of a public company. Specifically, we did not design and maintain sufficient processes to identify, assess, and communicate relevant risks to appropriate levels of the organization, including ***potential compliance issues received through the hotline process.*** In addition, ***we did not design and maintain adequate controls within the revenue process to appropriately recognize revenue for new services in accordance with Financial Accounting Standards Board Accounting Standards Codification Topic 606, Revenue from Contracts With Customers. These material weaknesses resulted in the restatement*** of our previously issued interim condensed combined/consolidated financial statements for the Impacted Periods. In addition, our Chief Executive Officer and our Interim Chief Financial Officer have concluded that, due to the material weaknesses, our disclosure controls and procedures were not effective, as such term is defined under Rules 13a-15(e) and 15(d)-15(e) under the Exchange Act, as of December 31, 2024.

232.    The 2024 Restated Form 10-K revealed that the Company restated $61 million in revenue as improperly recognized "due to regulatory, compliance and Medicare Part B billing uncertainties" related to its billing for "respiratory therapy, sensory integration therapy, and ultrasound mist therapy" in the first two quarters of 2024. Specifically, the 2024 Restated Form 10-K stated:

> [D]ue to regulatory, compliance and Medicare Part B billing uncertainties, management determined that it is appropriate to reconsider the Company's judgmental assessments of the compliance of its respiratory and certain other therapy services. Management also determined that it is appropriate to reconsider the application of certain aspects of revenue recognition guidance under Financial Accounting Standards Board (FASB) Accounting Standards Codification (ASC) Topic 606, Revenue from Contracts With Customers ("ASC606"), including with respect to estimating variable consideration and constraining estimated variable consideration related to revenue from billings for such services. As a result, the Company determined that the revenue associated with the provision of respiratory services and certain other therapy services billed under Medicare Part B should not have been recognized as revenue in accordance with ASC 606 in [the first half of 2024].

233.    The 2024 Restated Form 10-K also revealed that the officers of the Company were made aware shortly after the 2Q 2024 Form 10-Q that certain services may not be eligible for Medicare reimbursement. Specifically, the 2024 Restated Form 10-K stated, in relevant part:

Subsequent to the issuance of the Company's Quarterly Report on Form 10-Q filed on August 12, 2024, we received information that indicated certain ancillary services, including respiratory, sensory integration and wound care ultrasound mist therapy, may not be eligible for reimbursement under Medicare Part B. We determined that due to the underlying regulatory ambiguity those certain ancillary services revenue may be subject to significant reversal in the future. As such, we have concluded that such revenue should not be recognized until definitive conclusions regarding the eligibility of billing those certain ancillary services under Medicare Part B is permissible.

234. Investors were also made aware of an end-of-year refund liability of $145.8 million as of December 31, 2024. The refund liability related to cash the Company collected yet concurrently expects to refund to payors like Medicare. According to the 2025 Form 10-K, the refund liability is now approximately $181.1 million.

## THE INDIVIDUAL DEFENDANTS' KNOWLEDGE

235. Throughout the Relevant Period, the Individual Defendants had access to information regarding the Billing Misconduct, Patient Neglect Misconduct, Licensing and Certification Misconduct, and the Medical Record Misconduct.

236. For example, FE-5 stated that "100%" PACS' leadership knew that a Company Regional Vice President was hanging his license on multiple buildings. FE-5 further stated that the particular Regional Vice President was "buddies" with leadership and spoke to them regularly.

237. FE-4 also expressed his concerns to the Company's senior leadership regarding the Medical Record Misconduct. Specifically, FE-4 stated he sent an email to PACS; Marry May, the Company's HR Business Partner; Sally Cantell, Senior Vice President of People and Development; and John Mitchell, the Company's Chief Legal Officer. FE-4 received a response that he described as a "slap on the wrist," and he continued to see the Individual Defendants caused the Company to engage in the Medical Record Misconduct.

238.    FE-10 commented that the Company's C-suite executives instructed Company administrators to never give auditors more than they asked for, and to only provide summaries rather than documentation. FE-10 also detailed how he felt increasing pressure from PACS' senior management if his facilities targets were not being met. For example, FE-10 stated that PACS' regional vice presidents and C-suite regularly attended meetings discussing his facilities performance and strategies to increase revenue. FE-10 further elaborated that he had direct contact with the Company's senior management if his facility fell below targets and had received emails from Defendant Apt discussing which facilities needed to improve their revenue.

## **DAMAGES TO PACS**

239.    As a direct and proximate result of the Individual Defendants' conduct, PACS has lost and expended, and will continue to lose and expend, many millions of dollars.

240.    Such expenditures include, but are not limited to, legal fees, costs, and any payments for resolution of or to satisfy a judgment associated with the Securities Class Action, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

241.    Such expenditures also include, but are not limited to, fees, costs, and any payments for resolution of or to satisfy judgements associated with any other lawsuits filed against the Company or the Individual Defendants based on the misconduct alleged herein, and amounts paid to outside lawyers, accountants, and investigators in connection thereto.

242.    Such expenditures will also include costs incurred in any internal investigations pertaining to violations of law, costs incurred in defending any investigations or legal actions taken against the Company due to its violations of law, and payments of any fines or settlement amounts associated with the Company's violations, including costs associated with the civil investigative demands PACS received from the federal government regarding the Company's reimbursement

and referral practices.

243.    Additionally, these expenditures include, but are not limited to, unjust compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

244.    As a direct and proximate result of the Individual Defendants' conduct, PACS has also suffered and will continue to suffer a loss of reputation and goodwill, and a "liar's discount" that will plague the Company's stock price in the future due to the Company's and their misrepresentations.

## DERIVATIVE ALLEGATIONS

245.    Plaintiff brings this action derivatively and for the benefit of PACS to redress injuries suffered, and to be suffered, as a result of the Individual Defendants' breaches of their fiduciary duties as controlling shareholders, directors, and/or officers of PACS, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of the Exchange Act.

246.    PACS is named solely as a nominal party in this action. This is not a collusive action to confer jurisdiction on this Court that it would not otherwise have.

247.    Plaintiff is, and has been at all relevant times, a shareholder of PACS. Plaintiff will adequately and fairly represent the interests of PACS in enforcing and prosecuting its rights, and, to that end, has retained competent counsel, experienced in derivative litigation, to enforce and prosecute this action.

## DEMAND FUTILITY

248.    Plaintiff incorporates by reference and re-alleges each and every allegation stated above as if fully set forth herein.

249.    A pre-suit demand on the Board is futile and, therefore, excused. At the time of the commencement of this action, the Board consisted of the following six individuals: Defendants Murray, Dilsaver, Hancock, Leavitt, Millard (the "Director-Defendants"), and non-party Patrick H. Conway (collectively with the Director-Defendants, the "Directors"). Plaintiff needs only to allege demand futility as to three of the six Directors.

250.    Demand is excused as to all of the Director-Defendants because each one of them faces, individually and collectively, a substantial likelihood of liability as a result of the schemes they engaged in knowingly or recklessly to engage in the Billing Misconduct, Patient Neglect Misconduct, Licensing and Certification Misconduct, and the Medical Record Misconduct and to make and/or cause the Company to make false and misleading statements and omissions of material facts. This renders the Director-Defendants unable to impartially investigate the charges and decide whether to pursue action against themselves and the other perpetrators of the schemes.

251.    In complete abdication of their fiduciary duties, the Director-Defendants either knowingly or recklessly caused or permitted PACS to engage in the Billing Misconduct, Patient Neglect Misconduct, Licensing and Certification Misconduct, and the Medical Record Misconduct and to issue materially false and misleading statements. Specifically, the Director-Defendants caused PACS to issue false and misleading statements which were intended to make the Company appear more profitable and attractive to investors. Moreover, the Director-Defendants caused the Company to fail to maintain internal controls. As a result of the foregoing, the Director-Defendants breached their fiduciary duties, face a substantial likelihood of liability, are not disinterested, and demand upon them is futile, and thus excused.

252.    Additional reasons that demand on Defendant Murray is futile follow. Defendant Murray founded PACS in 2013 and has served as the Company's CEO and as Chairman of the

Board since its inception. As such, the Company provides Defendant Murray with his principal occupation for which he receives lucrative compensation. Thus, as the Company admits, Defendant Murray is a non-independent director. Defendant Murray is also a controlling shareholder of the Company. As PACS' CEO and as one of its trusted directors, Defendant Murray was ultimately responsible for all of the false and misleading statements and omissions that were made by or on behalf of himself and the Company during the Relevant Period. As a trusted Company director, Defendant Murray conducted little, if any, oversight of the schemes to cause the Company to engage in the Billing Misconduct, Patient Neglect Misconduct, Licensing and Certification Misconduct, and the Medical Record Misconduct and to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Additionally, Defendant Murray signed the false and misleading 1Q 2024 Form 10-Q, 2Q 2024 Form 10-Q, the IPO Materials, and the SPO materials. Further, Defendant Murray's insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the schemes. Defendant Murray is also a defendant in the Securities Class Action. For these reasons, Defendant Murray breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

253. Additional reasons that demand on Defendant Dilsaver is futile follow. Defendant Dilsaver has served as a Company director since May 9, 2024. She also serves as the Chair of the Nominating and Corporate Governance Committee and as a member of the Compensation Committee and Audit Committee. As a trusted Company director, she conducted little, if any,

oversight of the schemes  to cause the Company to engage in the Billing Misconduct, Patient Neglect Misconduct, Licensing and Certification Misconduct, and the Medical Record Misconduct and to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Dilsaver is also a defendant in the Securities Class Action. For these reasons, Defendant Dilsaver breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

254.    Additional reasons that demand on Defendant Hancock is futile follow. Defendant Hancock founded the Company since 2013 and has also served as Executive Vice Chairman of the Board since January 1, 2024, and as the Company's interim CFO since September 2, 2025.  As such, the Company provides Defendant Hancock with his principal occupation for which he receives lucrative compensation. Thus, as the Company admits, Defendant Hancock is a non-independent director. Defendant Hancock is also a controlling shareholder of the Company. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Billing Misconduct, Patient Neglect Misconduct, Licensing and Certification Misconduct, and the Medical Record Misconduct and to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Also, Defendant Hancock signed the false and misleading IPO Materials and SPO Materials. Further, Defendant Hancock's insider sales, made with knowledge of material nonpublic information before the material misstatements and omissions were exposed, demonstrate his motive in facilitating and participating in the schemes. Defendant Hancock is also

a defendant in the Securities Class Action. For these reasons, Defendant Hancock breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

255. Additional reasons that demand on Defendant Leavitt is futile follow. Defendant Leavitt has served as a Company director since July 2023. He also serves as Chair of the Compensation Committee and as a member of the Audit Committee and the Nominating and Governance Committee. As a trusted Company director, he conducted little, if any, oversight of the schemes to cause the Company to engage in the Billing Misconduct, Patient Neglect Misconduct, Licensing and Certification Misconduct, and the Medical Record Misconduct and to cause the Company to make false and misleading statements, consciously disregarded his duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded his duties to protect corporate assets. Defendant Leavitt is also a defendant in the Securities Class Action. For these reasons, Defendant Leavitt breached his fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon him is futile and, therefore, excused.

256. Additional reasons that demand on Defendant Millard is futile follow. Defendant Millard has served as a Company director since 2022. She also serves as Chair of the Audit Committee and as a member of the Nominating and Governance Committee and the Compensation Committee. As a trusted Company director, she conducted little, if any, oversight of the schemes to cause the Company to engage in the Billing Misconduct, Patient Neglect Misconduct, Licensing and Certification Misconduct, and the Medical Record Misconduct and to cause the Company to make false and misleading statements, consciously disregarded her duties to monitor internal controls over reporting and engagement in the schemes, and consciously disregarded her duties to

protect corporate assets. Defendant Millard is also a defendant in the Securities Class Action. For these reasons, Defendant Millard breached her fiduciary duties, faces a substantial likelihood of liability, is not independent or disinterested, and thus demand upon her is futile and, therefore, excused.

257. Additional reasons that demand on the Board is futile follow.

258. Defendants Millard (as Chair), Dilsaver, and Leavitt (collectively the "Audit Committee Defendants") served as members of the Audit Committee at all relevant times. As such, they were responsible for the effectiveness of the Company's internal controls, the truth and accuracy of the Company's financial statements, and the Company's compliance with applicable laws and regulations. During the Relevant Period, they violated the Charter by engaging in or permitting the Company to engage in the dissemination of materially false and misleading statements to the public and to facilitate the Individual Defendants' violations of law, including breaches of fiduciary duty and violations of the Securities Act and the Exchange Act; failed to adequately exercise their risk management and risk assessment functions; and failed to ensure adequate Board oversight of the Company's internal control over financial reporting, disclosure controls and procedures, and Code of Ethics. Thus, the Audit Committee Defendants breached their fiduciary duties, are not independent or disinterested, and thus demand is excused as to them.

259. In violation of the Code of Ethics, the Director-Defendants engaged in or permitted the schemes to cause the Company to engage in the Billing Misconduct, Patient Neglect Misconduct, Licensing and Certification Misconduct, and the Medical Record Misconduct and to issue materially false and misleading statements to the investing public, and to facilitate and disguise the Individual Defendants' violations of law, including breaches of fiduciary duty, unjust enrichment, abuse of control, gross mismanagement, waste of corporate assets, and violations of

the Securities Act and the Exchange Act. In addition, the Individual Defendants violated the Code of Ethics by failing to act with integrity, failing to avoid conflicts of interest, failing to ensure the Company's disclosures were accurate, failing to ensure the Company complied with applicable laws, rules, and regulations, and failing to promptly report known violations of the Code of Ethics and the law. Thus, the Director-Defendants breached the Company's own Code of Ethics, are not disinterested, and demand is excused as to them.

260.    PACS has been and will continue to be exposed to significant losses due to the wrongdoing complained of herein, yet the Director-Defendants have not filed any lawsuits against the Individual Defendants or any others who were responsible for that wrongful conduct to attempt to recover for PACS any part of the damages PACS suffered and will continue to suffer thereby. Thus, any demand upon the Director-Defendants would be futile.

261.    The Individual Defendants' conduct described herein and summarized above could not have been the product of legitimate business judgment as it was based on bad faith and intentional, reckless, or disloyal misconduct. Thus, none of the Director-Defendants can claim exculpation from their violations of duty pursuant to the Company's charter (to the extent such a provision exists). As a majority of the Director-Defendants face a substantial likelihood of liability, they are self-interested in the transactions challenged herein and are not capable of exercising independent and disinterested judgment about whether to pursue this action on behalf of the shareholders of the Company. Accordingly, demand is excused as being futile.

262.    The acts complained of herein constitute violations of fiduciary duties owed by PACS' controlling shareholders, officers, and directors, and these acts are incapable of ratification.

263.    The Director-Defendants may also be protected against personal liability for their acts of mismanagement and breaches of fiduciary duty alleged herein by directors' and officers'

liability insurance if they caused the Company to purchase it for their protection with corporate funds, i.e., monies belonging to the stockholders of PACS. If there is a directors' and officers' liability insurance policy covering the Director-Defendants, it may contain provisions that eliminate coverage for any action brought directly by the Company against the Director-Defendants, known as, *inter alia*, the "insured-versus-insured exclusion." As a result, if the Director-Defendants were to sue themselves or certain of the officers of PACS, there would be no directors' and officers' insurance protection. Accordingly, the Director-Defendants cannot be expected to bring such a suit. On the other hand, if the suit is brought derivatively, as this action is brought, such insurance coverage, if such an insurance policy exists, will provide a basis for the Company to effectuate a recovery. Thus, demand on the Director-Defendants is futile and, therefore, excused.

264.    If there is no directors' and officers' liability insurance, then the Director-Defendants will not cause PACS to sue the Individual Defendants named herein, since, if they did, they would face a large uninsured individual liability. Accordingly, demand is futile in that event, as well.

265.    Thus, for all of the reasons set forth above, all of the Director-Defendants, and, if not all of them, at least four of the Director-Defendants, cannot consider a demand with disinterestedness and independence. Consequently, a demand upon the Board is excused as futile.

### FIRST CLAIM
**Against the Individual Defendants for Breach of Fiduciary Duties**

266.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

267.    Each Individual Defendant owed to the Company the duty to exercise candor, good

faith, and loyalty in the management and administration of PACS' business and affairs.

268. Each of the Individual Defendants violated and breached his or her fiduciary duties of candor, good faith, loyalty, reasonable inquiry, oversight, and supervision.

269. The Individual Defendants' conduct set forth herein was due to their intentional or reckless breach of fiduciary duties they owed to the Company, as alleged herein. The Individual Defendants intentionally or recklessly breached or disregarded their fiduciary duties to protect the rights and interests of PACS.

270. In breach of their fiduciary duties, the Individual Defendants caused or permitted the Company to engage in the Billing Misconduct, Patient Neglect Misconduct, Licensing and Certification Misconduct, and the Medical Record Misconduct.

271. The Individual Defendants also breached their fiduciary duties by personally making and/or causing the Company to make to the investing public a series of materially false and misleading statements about PACS' business, operations, and prospects. Specifically, the Individual Defendants willfully or recklessly made and/or caused the Company to make false and misleading statements to the investing public that failed to disclose, *inter alia*, that, with regard to the Company's financial statements, Defendants knew and/or recklessly disregarded that: (1) PACS engaged in the Billing Misconduct, the Patient Neglect Misconduct, the Licensing and Certification Misconduct,  and the Medical Record Misconduct; (2) as a result of the misconduct, PACS' revenues were artificially inflated and required a restatement; (3) PACS' compliance with laws and regulations were overstated; and (4) as a result of the foregoing, PACS' risk disclosures mischaracterized adverse facts that the Company was actually facing as mere possibilities. As a result of the foregoing, the Individual Defendants' statements about the Company's business, operations, and prospects were materially false and misleading and/or lacked a reasonable basis at

all relevant times.

272. In further breach of their fiduciary duties, the Individual Defendants failed to correct and/or caused the Company to fail to correct the false and/or misleading statements and/or omissions of material fact, which renders them personally liable to the Company for breaching their fiduciary duties.

273. Also in breach of their fiduciary duties, the Individual Defendants failed to maintain internal controls.

274. In yet further breach of their fiduciary duties, during the Relevant Period, six of the Individual Defendants engaged in lucrative insider sales, netting proceeds of approximately $669.5 million.

275. The Individual Defendants had actual or constructive knowledge that they had caused the Company to improperly engage in the fraudulent schemes set forth herein and to fail to maintain internal controls. The Individual Defendants had actual knowledge that the Company was engaging in the fraudulent schemes set forth herein, and that internal controls were not adequately maintained, or acted with reckless disregard for the truth, in that they caused the Company to improperly engage in the fraudulent schemes and to fail to maintain adequate internal controls, even though such facts were available to them. Such improper conduct was committed knowingly or recklessly and for the purpose and effect of artificially inflating the price of PACS' securities. The Individual Defendants, in good faith, should have taken appropriate action to correct the schemes alleged herein and to prevent them from continuing to occur.

276. These actions were not a good-faith exercise of prudent business judgment to protect and promote the Company's corporate interests.

277. As a direct and proximate result of the Individual Defendants' breaches of their

fiduciary obligations, PACS has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

278. Plaintiff, on behalf of PACS, has no adequate remedy at law.

## SECOND CLAIM
### Against the Individual Defendants for Unjust Enrichment

279. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

280. By their wrongful acts, violations of law, and false and misleading statements and omissions of material fact that they made and/or caused to be made, the Individual Defendants were unjustly enriched at the expense of, and to the detriment of, PACS.

281. The Individual Defendants either benefitted financially from the improper conduct, or received bonuses, stock options, or similar compensation from PACS that was tied to the performance or artificially inflated valuation of PACS, or received compensation or other payments that were unjust in light of the Individual Defendants' bad faith conduct. This includes lavish compensation, benefits, and other payments provided to the Individual Defendants who breached their fiduciary duties to the Company.

282. Plaintiff, as a shareholder and representative of PACS, seeks restitution from the Individual Defendants and seeks an order from this Court disgorging all profits, including from insider transactions, benefits, and other compensation, including any performance-based or valuation-based compensation, obtained by the Individual Defendants due to their wrongful conduct and breach of their fiduciary and contractual duties.

283. Plaintiff, on behalf of PACS, has no adequate remedy at law.

### THIRD CLAIM
**Against the Individual Defendants for Abuse of Control**

284. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

285. The Individual Defendants' misconduct alleged herein constituted an abuse of their ability to control and influence PACS, for which they are legally responsible.

286. As a direct and proximate result of the Individual Defendants' abuse of control, PACS has sustained significant damages. As a direct and proximate result of the Individual Defendants' breaches of their fiduciary obligations of candor, good faith, and loyalty, PACS has sustained and continues to sustain significant damages. As a result of the misconduct alleged herein, the Individual Defendants are liable to the Company.

287. Plaintiff, on behalf of PACS, has no adequate remedy at law.

### FOURTH CLAIM
**Against the Individual Defendants for Gross Mismanagement**

288. Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

289. By their actions alleged herein, the Individual Defendants, either directly or through aiding and abetting, abandoned and abdicated their responsibilities and fiduciary duties with regard to prudently managing the assets and business of PACS in a manner consistent with the operations of a publicly held corporation.

290. As a direct and proximate result of the Individual Defendants' gross mismanagement and breaches of duty alleged herein, PACS has sustained and will continue to sustain significant damages.

291. As a result of the misconduct and breaches of duty alleged herein, the Individual

- 91 -

Defendants are liable to the Company.

292.    Plaintiff, on behalf of PACS, has no adequate remedy at law.

## FIFTH CLAIM
### Against the Individual Defendants for Waste of Corporate Assets

293.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

294.    As a result of the foregoing, and by failing to properly consider the interests of the Company and its public shareholders, the Individual Defendants have caused PACS to waste valuable corporate assets, to incur many millions of dollars of legal liability and/or costs to defend unlawful actions, to incur losses as a result of the Restatement, and to lose assets from investors and customers who no longer trust the Company.

295.    As a result of the waste of corporate assets, the Individual Defendants are each liable to the Company.

296.    Plaintiff, on behalf of PACS, has no adequate remedy at law.

## SIXTH CLAIM
### Against Defendants Murray, Hancock,  Jergensen, Sanford, Apt, Lewis, Millard, Leavitt, and Dilsaver for Contribution Under Sections 11(f) of the Securities Act and 21D of the Exchange Act

297.    Plaintiff incorporates by reference and re-alleges each and every allegation set forth above, as though fully set forth herein.

298.    As a result of the conduct and events alleged above, the Company is a defendant in the Securities Class Action brought on behalf of PACS shareholders, in which it is a joint tortfeasor in claims brought under Sections 11, 12, and 15 of the Securities Act

299.    Federal law provides PACS with a cause of action against other alleged joint

tortfeasors under Section 11(f) of the Securities Act.

300. The plaintiffs in the Securities Class Action allege that the IPO Materials and SPO Materials in connection with the Company's offerings contained untrue statements of material facts or omitted to state other facts necessary to make the statement made not misleading and omitted to state material facts required to be stated therein.

301. PACS is a registrant for the offerings and the Defendants Murray, Hancock, Jergensen, Sanford, Apt, Lewis, Millard, Leavitt, and Dilsaver named herein were responsible for the contents and dissemination of the IPO materials and SPO Materials.

302. The plaintiffs in the Securities Class Action allege that none of the defendants named therein made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the IPO Materials and SPO Materials and other subsequent public filings were true and without omissions of any material facts and were not misleading.

303. Defendants Murray, Hancock, Jergensen, Sanford,  Apt, Lewis, Millard, Leavitt, and Dilsaver , because of their positions of control and authority as controlling shareholders, officers, and/or directors of PACS, were able to and did, directly and/or indirectly, exercise control over the business and corporate affairs of PACS, including the wrongful acts complained of herein and in the Securities Class Action.

304. Accordingly, Defendants Murray, Hancock, Jergensen, Sanford, Apt, Lewis, Millard, Leavitt, and Dilsaver  are liable under Section 11(f) of the Securities Act, 14 U.S.C. §77k(f)(1), which creates a private right of action for contribution, and Section 21D of the Exchange Act, 15 U.S.C. §78u-4(f), which governs the application of a private right of action for contribution arising out of violations of the Exchange Act.

305. As such, PACS is entitled to receive all appropriate contribution or indemnification

from Defendants Murray, Hancock, Jergensen, Sanford, Apt, Lewis, Millard, Leavitt, and Dilsaver.

306.    Plaintiff, on behalf of PACS, has no adequate remedy at law.

## REQUEST FOR RELIEF

FOR THESE REASONS, Plaintiff demands judgment in the Company's favor against all Individual Defendants as follows:

(a)    Declaring that Plaintiff may maintain this action on behalf of PACS, and that Plaintiff is an adequate representative of the Company;

(b)    Declaring that the Individual Defendants have breached and/or aided and abetted the breach of their fiduciary duties to PACS;

(c)    Determining and awarding to PACS the damages sustained by it as a result of the violations set forth above from each of the Individual Defendants, jointly and severally, together with pre-judgment and post-judgment interest thereon;

(d)    Directing PACS and the Individual Defendants to take all necessary actions to reform and improve PACS' corporate governance and internal procedures to comply with applicable laws and to protect PACS and its shareholders from a repeat of the damaging events described herein, including, but not limited to, putting forward for shareholder vote the following resolutions for amendments to the Company's Bylaws or Articles of Incorporation and taking the following actions as may be necessary to ensure proper corporate governance policies:

1. a proposal to strengthen the Board's supervision of operations and develop and implement procedures for greater shareholder input into the policies and guidelines of the Board;

2. a provision to permit the shareholders of PACS to nominate at least four

candidates for election to the Board; and

  3. a proposal to ensure the establishment of effective oversight of compliance with applicable laws, rules, and regulations.

  (e)  Awarding PACS restitution from the Individual Defendants, and each of them;

  (f)  Awarding Plaintiff the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs, and expenses; and

  (g)  Granting such other and further relief as the Court may deem just and proper.

## JURY DEMAND

  Plaintiff hereby demands a trial by jury.

Dated: April 17, 2026      **ANDERSON & KARRENBERG**

             */s/ Jared D. Scott*
             Jared D. Scott
             250 E. 200 S., Suite 340
             Salt Lake City, UT 84111
             Email: jscott@aklawfirm.com

             **THE BROWN LAW FIRM, P.C.**
             Saadia Hashmi
             767 Third Avenue, Suite 2501
             New York, NY 10017
             Telephone: (516) 922-5427
             Facsimile: (516) 344-6204
             Email: shashmi@thebrownlawfirm.net

             *Counsel for Plaintiff*

Docusign Envelope ID: 21782F93-7715-4AB1-AA49-01F79CEEF756

## **VERIFICATION**

I, Emily Jean Boers, am a plaintiff in the within action.  I have reviewed the allegations made in this Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. To those allegations of which I have personal knowledge, I believe those allegations to be true. As to those allegations of which I do not have personal knowledge, I rely upon my counsel and their investigation and believe them to be true.

I declare under penalty of perjury that the foregoing is true and correct.  Executed this 15th  day of April, 2026.

Signed by:

*Emily Jean Boers*

D77447DDA6064AD...

Emily Jean Boers